# BAREFOOT *v.* ESTELLE, DIRECTOR, TEXAS DEPARTMENT OF CORRECTIONS

No. 82–6080.  Argued April 26, 1983—Decided July 6, 1983

*Will Gray* argued the cause for petitioner. With him on the briefs was *Carolyn Garcia*.

*Jack Greenberg* argued the cause for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal. With him on the brief were *James M. Nabrit III, Joel Berger, John Charles Boger, Deborah Fins, James S. Liebman,* and *Anthony G. Amsterdam.*

*Douglas M. Becker,* Assistant Attorney General of Texas, argued the cause for respondent. With him on the brief were *Jim Mattox,* Attorney General, and *David R. Richards,* Executive Assistant Attorney General.*

JUSTICE WHITE delivered the opinion of the Court.

We have two questions before us in this case: whether the District Court erred on the merits in rejecting the petition for habeas corpus filed by petitioner, and whether the Court of Appeals for the Fifth Circuit correctly denied a stay of execution of the death penalty pending appeal of the District Court's judgment.

I

On November 14, 1978, petitioner was convicted of the capital murder of a police officer in Bell County, Tex. A separate sentencing hearing before the same jury was then held to determine whether the death penalty should be imposed. Under Tex. Code Crim. Proc. Ann., Art. 37.071 (Vernon 1981),[1] two special questions were to be submitted to the

---

*Joel I. Klein* filed a brief for the American Psychiatric Association as *amicus curiae* urging reversal.

*Daniel J. Popeo, Paul D. Kamenar,* and *Nicholas E. Calio* filed a brief for the Washington Legal Foundation as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *Morris Harrell, Marna S. Tucker,* and *E. Barrett Prettyman, Jr.,* for the American Bar Association; by *Gerald H. Goldstein, Maury Maverick,* and *Burt Neuborne* for the Texas Civil Liberties Union et al.; and by *Jim Smith,* Attorney General of Florida, and *Charles Corces, Jr.,* Assistant Attorney General, for the State of Florida et al.

[1] Texas Code Crim. Proc. Ann., Art. 37.071 (Vernon 1981), provides:

"(a) Upon a finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether

jury: whether the conduct causing death was "committed deliberately and with reasonable expectation that the death of the deceased or another would result"; and whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The State introduced into evidence petitioner's prior convictions and his reputation for lawlessness. The State also called two psychiatrists, John Holbrook and James Grigson, who, in response to hypothetical questions, testified that petitioner would probably commit further acts of violence and represent a continuing threat to society. The jury answered both of the questions put to them in the affirmative, a result which required the imposition of the death penalty.

On appeal to the Texas Court of Criminal Appeals, petitioner urged, among other submissions, that the use of psychiatrists at the punishment hearing to make predictions

---

the defendant shall be sentenced to death or life imprisonment. The proceeding shall be conducted in the trial court before the trial jury as soon as practicable. In the proceeding, evidence may be presented as to any matter that the court deems relevant to sentence. This subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or of the State of Texas. The state and the defendant or his counsel shall be permitted to present argument for or against sentence of death.

"(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

"(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and

"(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

"(c) The state must prove each issue submitted beyond a reasonable doubt, and the jury shall return a special verdict of 'yes' or 'no' on each issue submitted."

The question specified in (b)(3) was not submitted to the jury.

about petitioner's future conduct was unconstitutional because psychiatrists, individually and as a class, are not competent to predict future dangerousness.  Hence, their predictions are so likely to produce erroneous sentences that their use violated the Eighth and Fourteenth Amendments. It was also urged, in any event, that permitting answers to hypothetical questions by psychiatrists who had not personally examined petitioner was constitutional error.  The court rejected all of these contentions and affirmed the conviction and sentence on March 12, 1980, *Barefoot* v. *State*, 596 S. W. 2d 875; rehearing was denied on April 30, 1980.

Petitioner's execution was scheduled for September 17, 1980.  On July 29, this Court granted a stay of execution pending the filing and disposition of a petition for certiorari, which was filed and then denied on June 29, 1981.  *Barefoot* v. *Texas*, 453 U. S. 913.  Petitioner's execution was again scheduled by the state courts, this time for October 13, 1981. An application for habeas corpus to the Texas Court of Criminal Appeals was denied on October 7, 1981, whereafter a petition for habeas corpus was filed in the United States District Court for the Western District of Texas.  Among other issues, petitioner raised the same claims with respect to the use of psychiatric testimony that he had presented to the state courts.  The District Court stayed petitioner's execution pending action on the petition.  An evidentiary hearing was held on July 28, 1982, at which petitioner was represented by competent counsel.  On November 9, 1982, the District Court filed its findings and conclusions, rejecting each of the several grounds asserted by petitioner.  The writ was accordingly denied; also, the stay of petitioner's death sentence was vacated.  The District Court, however, granted petitioner's motion to proceed *in forma pauperis* and issued a certificate of probable cause pursuant to 28 U. S. C. § 2253, which provides that an appeal may not be taken to the court of appeals from the final order in a habeas corpus proceeding where the detention complained of arises out of process issued by a state court "unless the justice or judge who

rendered the order or a circuit justice or judge issues a certificate of probable cause." Notice of appeal was filed on November 24, 1982.

At this point, the Texas courts set January 25, 1983, as the new execution date. A petition for habeas corpus and motion for stay of execution were then denied by the Texas Court of Criminal Appeals on December 21, 1982, and another motion for stay of execution was denied by the same court on January 11, 1983.

On January 14, petitioner moved the Court of Appeals for the Fifth Circuit to stay his execution pending consideration of his appeal from the denial of his petition for habeas corpus. On January 17, the parties were notified to present briefs and oral argument to the court on January 19. The case was heard on January 19, and, on January 20, the Court of Appeals issued an opinion and judgment denying the stay. 697 F. 2d 593 (1983). The court's opinion recited that the court had studied the briefs and record filed and had heard oral argument at which petitioner's attorney was allowed unlimited time to discuss any matter germane to the case. The Court of Appeals was of the view that by giving the parties unlimited opportunity to brief and argue the merits as they saw fit, the requirements set forth in this Court's cases, such as *Garrison* v. *Patterson*, 391 U. S. 464 (1968), *Nowakowski* v. *Maroney*, 386 U. S. 542 (1967), and *Carafas* v. *LaVallee*, 391 U. S. 234 (1968), were satisfied. As the court understood those cases, when a certificate of probable cause is issued by the district court, the court of appeals must give the parties an opportunity to address the merits. In its view, the parties had been given "an unlimited opportunity to make their contentions upon the underlying merits by briefs and oral argument." 697 F. 2d, at 596. The Court of Appeals then proceeded to address the merits of the psychiatric testimony issue, together with new claims not presented to the District Court, that the state court had no jurisdiction to resentence petitioner and that newly discovered evidence war-

ranted a new trial. Each of the grounds was discussed by the court and rejected. The court concluded that since the petition had no substantial merit, a stay should be denied.

Petitioner then filed an application for stay of execution with the Circuit Justice for the Fifth Circuit, who referred the matter to the Court. On January 24, 1983, the Court stayed petitioner's execution and, treating the application for stay as a petition for writ of certiorari before judgment, granted certiorari. 459 U. S. 1169. The parties were directed to brief and argue "the question presented by the application, namely, the appropriate standard for granting or denying a stay of execution pending disposition of an appeal by a federal court of appeals by a death-sentenced federal habeas corpus petitioner, and also the issues on appeal before the United States Court of Appeals for the Fifth Circuit." *Ibid.* The case was briefed and orally argued here, and we now affirm the judgment of the District Court.

## II

With respect to the procedures followed by the Court of Appeals in refusing to stay petitioner's death sentence, it must be remembered that direct appeal is the primary avenue for review of a conviction or sentence, and death penalty cases are no exception. When the process of direct review—which, if a federal question is involved, includes the right to petition this Court for a writ of certiorari—comes to an end, a presumption of finality and legality attaches to the conviction and sentence. The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited. Federal courts are not forums in which to relitigate state trials. Even less is federal habeas a means by which a defendant is entitled to delay an execution indefinitely. The procedures adopted to facilitate the orderly consideration and disposition of habeas petitions are not legal entitlements that a defendant has a right to pursue irrespective of the contribution these procedures make toward

uncovering constitutional error. "It is natural that counsel for the condemned in a capital case should lay hold of every ground which, in their judgment, might tend to the advantage of their client, but the administration of justice ought not to be interfered with on mere pretexts." *Lambert* v. *Barrett*, 159 U. S. 660, 662 (1895). Furthermore, unlike a term of years, a death sentence cannot begin to be carried out by the State while substantial legal issues remain outstanding. Accordingly, federal courts must isolate the exceptional cases where constitutional error requires retrial or resentencing as certainly and swiftly as orderly procedures will permit. They need not, and should not, however, fail to give nonfrivolous claims of constitutional error the careful attention that they deserve.

For these reasons, we granted certiorari before judgment to determine whether the Court of Appeals erred in refusing to stay petitioner's death sentence.

## A

Petitioner urges that the Court of Appeals improperly denied a stay of execution while failing to act finally on his appeal. He suggests the possibility of remanding the case to the Court of Appeals without reaching the merits of the District Court's judgment. The heart of petitioner's submission is that the Court of Appeals, unless it believes the case to be entirely frivolous, was obligated to decide the appeal on its merits in the usual course and must, in a death case, stay the execution pending such disposition. The State responds that the Court of Appeals reached and decided the merits of the issues presented in the course of denying the stay and that petitioner had ample opportunity to address the merits.

We have previously held that "if an appellant persuades an appropriate tribunal that probable cause for an appeal exists, he must then be afforded an opportunity to address the underlying merits." *Garrison* v. *Patterson, supra,* at 466 *(per curiam).* See *Nowakowski* v. *Maroney, supra; Carafas* v.

*LaVallee, supra.* These decisions indicate that if a court of appeals is unable to resolve the merits of an appeal before the scheduled date of execution, the petitioner is entitled to a stay of execution to permit due consideration of the merits. But we have also held that the requirement of a decision on the merits "does not prevent the courts of appeals from adopting appropriate summary procedures for final disposition of such cases." *Garrison* v. *Patterson,* 391 U. S., at 466. See *Carafas* v. *LaVallee,* 391 U. S., at 242. In *Garrison,* after examining our prior holdings, we concluded:

> "[N]othing [in these cases] prevents the courts of appeals from considering the questions of probable cause and the merits together, and nothing said there or here necessarily requires full briefing in every instance in which a certificate is granted. We hold only that where an appeal possesses sufficient merit to warrant a certificate, the appellant must be afforded adequate opportunity to address the merits, and that if a summary procedure is adopted the appellant must be informed, by rule or otherwise, that his opportunity will be limited." 391 U. S., at 466.

We emphasized, *ibid.,* that there must be ample evidence that in disposing of the appeal, the merits have been addressed, but that nothing in the cases or the applicable rules prevents a court of appeals from adopting summary procedures in such cases.

On the surface, it is not clear whether the Fifth Circuit's recent practice of requiring a showing of some prospect of success on the merits before issuing a stay of execution, *O'Bryan* v. *Estelle,* 691 F. 2d 706, 708 (1982); *Brooks* v. *Estelle,* 697 F. 2d 586 (1982), comports with these requirements. Approving the execution of a defendant before his appeal is decided on the merits would clearly be improper under *Garrison, Nowakowski,* and *Carafas.* However, a practice of deciding the merits of an appeal, when possible,

together with the application for a stay, is not inconsistent with our cases.

It appears clear that the Court of Appeals in this case pursued the latter course. The Court of Appeals was fully aware of our precedents and ruled that their requirements were fully satisfied. After quoting from *Garrison*, the Court of Appeals said:

> "Our actions here fall under this language. Petitioner's motion is directed solely to the merits. The parties have been also afforded an unlimited opportunity to make their contentions upon the underlying merits and oral argument. This opinion demonstrates the reasons for our decision." 697 F. 2d, at 596.

In a section of its opinion entitled "Merits of Appeal: Psychiatric Testimony on Dangerousness," the Court of Appeals then proceeded to address that issue and reject petitioner's contentions.

The course pursued by the Court of Appeals in this case was within the bounds of our prior decisions. In connection with acting on the stay, the parties were directed to file briefs and to present oral argument. In light of the Fifth Circuit's announced practice, *O'Bryan* v. *Estelle, supra; Brooks* v. *Estelle, supra,* it was clear that whether a stay would be granted depended on the probability of success on the merits. The parties addressed the merits and were given unlimited time to present argument. We do not agree that petitioner and his attorneys were prejudiced in their preparation of the appeal. The primary issue presented had been briefed and argued throughout the proceedings in the state courts and rebriefed and reargued in the District Court's habeas corpus proceeding. From the time the District Court ruled on the petition on November 9, 1982, petitioner had 71 days in which to prepare the briefs and arguments which were presented to the Fifth Circuit on January 19, 1983.

Although the Court of Appeals did not formally affirm the judgment of the District Court, there is no question that the Court of Appeals ruled on the merits of the appeal, as its concluding statements demonstrate:

> "This Court has had the benefit of the full trial court record except for a few exhibits unimportant to our considerations. We have read the arguments and materials filed by the parties. The petitioner is represented here, as he has been throughout the habeas corpus proceedings in state and federal courts, by a competent attorney experienced in this area of the law. We have heard full arguments in open court. Finding no patent substantial merit, or semblance thereof, to petitioner's constitutional objections, we must conclude and order that the motion for stay should be DENIED." 697 F. 2d, at 599–600.

It would have been advisable, once the court had addressed the merits and arrived at these conclusions, to verify the obvious by expressly affirming the judgment of the District Court, as well as to deny the stay. The court's failure to do so, however, does not conflict with *Garrison* and related cases. Indeed, in *Garrison* itself, the Court noted that "[i]n an effort to determine whether the merits had been addressed . . . this Court solicited further submissions from the parties in this case." 391 U. S., at 466, n. 2. If a formal decision on the merits were required, this inquiry would have been pointless. Moreover, the Court of Appeals cannot be faulted for not formally affirming the judgment of the District Court since this Court, over the dissent of three Justices arguing as petitioner does here, refused to stay an execution in a case where the Court of Appeals followed very similar procedures. *Brooks* v. *Estelle*, 459 U. S. 1061 (1982).[2]

---

[2] In that case, we treated the application for stay as a petition for certiorari or in the alternative as a petition for certiorari before judgment. We denied the petition on either assumption.

Although the Court of Appeals moved swiftly to decide the stay, this does not mean that its treatment of the merits was cursory or inadequate. On the contrary, the court's resolution of the primary issue on appeal, the admission of psychiatric testimony on dangerousness, reflects careful consideration. For these reasons, to remand to the Court of Appeals for verification that the judgment of the District Court was affirmed would be an unwarranted exaltation of form over substance.

B

That the Court of Appeals' handling of this case was tolerable under our precedents is not to suggest that its course should be accepted as the norm or as the preferred procedure. It is a matter of public record that an increasing number of death-sentenced petitioners are entering the appellate stages of the federal habeas process. The fair and efficient consideration of these appeals requires proper procedures for the handling of applications for stays of executions and demands procedures that allow a decision on the merits of an appeal accompanying the denial of a stay. The development of these procedures is primarily a function of the courts of appeals and the rulemaking processes of the federal courts, but the following general guidelines can be set forth.

*First.* Congress established the requirement that a prisoner obtain a certificate of probable cause to appeal in order to prevent frivolous appeals from delaying the States' ability to impose sentences, including death sentences.[3] The pri-

---

[3] The Habeas Corpus Act of 1867, Act of Feb. 5, 1867, ch. 28, § 1, 14 Stat. 385, the first Act empowering federal courts to issue a writ of habeas corpus for persons in state custody, imposed an automatic stay of "any proceeding against such person" pending "such proceedings or appeal" involved in determination of a prisoner's petition. *Id.*, at 386; see Rev. Stat. § 766. This provision required a stay of execution pending disposition of an appeal in capital cases. *Rogers* v. *Peck*, 199 U. S. 425, 436 (1905); *Lambert* v. *Barrett*, 159 U. S. 660, 662 (1895). In 1908, concerned with the increasing number of frivolous habeas corpus petitions challenging capital sentences which delayed execution pending completion of the appellate process, Con-

mary means of separating meritorious from frivolous appeals should be the decision to grant or withhold a certificate of probable cause. It is generally agreed that "probable cause requires something more than the absence of frivolity and that the standard is a higher one than the 'good faith' requirement of § 1915." Blackmun, Allowance of In Forma Pauperis Appeals in § 2255 and Habeas Corpus Cases, 43 F. R. D. 343, 352 (1967). We agree with the weight of opinion in the Courts of Appeals that a certificate of probable cause requires petitioner to make a "substantial showing of the denial of [a] federal right." *Stewart* v. *Beto*, 454 F. 2d 268, 270, n. 2 (CA5 1971), cert. denied, 406 U. S. 925 (1972). See also *Ramsey* v. *Hand*, 309 F. 2d 947, 948 (CA10 1962); *Goode* v. *Wainwright*, 670 F. 2d 941 (CA11 1982).[4] In a capital case, the nature of the penalty is a proper consideration in determining whether to issue a certificate of probable cause, but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.

*Second.* When a certificate of probable cause is issued by the district court, as it was in this case, or later by the court of appeals, petitioner must then be afforded an opportunity to address the merits, and the court of appeals is obligated to decide the merits of the appeal. Accordingly, a court of appeals, where necessary to prevent the case from becoming

gress inserted the requirement that a prisoner first obtain a certificate of probable cause to appeal before being entitled to do so. Act of Mar. 10, 1908, ch. 76, 35 Stat. 40. See H. R. Rep. No. 23, 60th Cong., 1st Sess., 1–2 (1908); 42 Cong. Rec. 608–609 (1908).

[4] The following quotation cogently sums up this standard:

"In requiring a 'question of some substance', or a 'substantial showing of the denial of [a] federal right,' obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor. Rather, he must demonstrate that the issues are debatable among jurists of reason; that a court *could* resolve the issues [in a different manner]; or that the questions are 'adequate to deserve encouragement to proceed further.'" *Gordon* v. *Willis*, 516 F. Supp. 911, 913 (ND Ga. 1980) (citing *United States ex rel. Jones* v. *Richmond*, 245 F. 2d 234 (CA2), cert. denied, 355 U. S. 846 (1957)).

moot by the petitioner's execution, should grant a stay of execution pending disposition of an appeal when a condemned prisoner obtains a certificate of probable cause on his initial habeas appeal.

*Third.* As our earlier cases have indicated, a court of appeals may adopt expedited procedures in resolving the merits of habeas appeals, notwithstanding the issuance of a certificate of probable cause. If a circuit chooses to follow this course, it would be advisable to promulgate a local rule stating the manner in which such cases will be handled and informing counsel that the merits of an appeal may be decided upon the motion for a stay. Even without special procedures, it is entirely appropriate that an appeal which is "frivolous and entirely without merit" be dismissed after the hearing on a motion for a stay. See, *e. g.*, Local Rule 20, Court of Appeals for the Fifth Circuit. We caution that the issuance of a certificate of probable cause generally should indicate that an appeal is not legally frivolous, and that a court of appeals should be confident that petitioner's claim is squarely foreclosed by statute, rule, or authoritative court decision, or is lacking any factual basis in the record of the case, before dismissing it as frivolous.

If an appeal is not frivolous, a court of appeals may still choose to expedite briefing and hearing the merits of all or of selected cases in which a stay of a death sentence has been requested, provided that counsel has adequate opportunity to address the merits and knows that he is expected to do so. If appropriate notice is provided, argument on the merits may be heard at the same time the motion for a stay is considered, and the court may thereafter render a single opinion deciding both the merits and the motion, unless exigencies of time preclude a considered decision on the merits, in which case the motion for a stay must be granted. In choosing the procedures to be used, the courts should consider whether the delay that is avoided by summary procedures warrants departing from the normal, untruncated processes of appel-

late review. In instances where expedition of the briefing and argument schedule is not ordered, a court of appeals may nevertheless choose to advance capital cases on the docket so that the decision of these appeals is not delayed by the weight of other business.

*Fourth.* Second and successive federal habeas corpus petitions present a different issue. "To the extent that these involve the danger that a condemned inmate might attempt to use repeated petitions and appeals as a mere delaying tactic, the State has a quite legitimate interest in preventing such abuses of the writ." Brief for NAACP Legal Defense and Educational Fund, Inc., as *Amicus Curiae* 40–41. Title 28 U. S. C. § 2254 Rule 9(b) states that "a second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief . . . [or if] the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ." See *Sanders* v. *United States,* 373 U. S. 1, 18 (1963); Advisory Committee Note to Rule 9(b), 28 U. S. C., p. 273. Even where it cannot be concluded that a petition should be dismissed under Rule 9(b), it would be proper for the district court to expedite consideration of the petition. The granting of a stay should reflect the presence of substantial grounds upon which relief might be granted.

*Fifth.* Stays of execution are not automatic pending the filing and consideration of a petition for a writ of certiorari from this Court to the court of appeals that has denied a writ of habeas corpus. It is well established that there " 'must be a reasonable probability that four Members of the Court would consider the underlying issue sufficiently meritorious for the grant of certiorari or the notation of probable jurisdiction; there must be a significant possibility of reversal of the lower court's decision; and there must be a likelihood that irreparable harm will result if that decision is not stayed.' " *White* v. *Florida,* 458 U. S. 1301, 1302 (1982) (POWELL, J., in chambers) (quoting *Times-Picayune Publishing Corp.* v.

*Schulingkamp*, 419 U. S. 1301, 1305 (1974) (POWELL, J., in chambers)). Applications for stays of death sentences are expected to contain the information and materials necessary to make a careful assessment of the merits of the issue and so reliably to determine whether plenary review and a stay are warranted. A stay of execution should first be sought from the court of appeals, and this Court generally places considerable weight on the decision reached by the courts of appeals in these circumstances.

### III

Petitioner's merits submission is that his death sentence must be set aside because the Constitution of the United States barred the testimony of the two psychiatrists who testified against him at the punishment hearing. There are several aspects to this claim. First, it is urged that psychiatrists, individually and as a group, are incompetent to predict with an acceptable degree of reliability that a particular criminal will commit other crimes in the future and so represent a danger to the community. Second, it is said that in any event, psychiatrists should not be permitted to testify about future dangerousness in response to hypothetical questions and without having examined the defendant personally. Third, it is argued that in the particular circumstances of this case, the testimony of the psychiatrists was so unreliable that the sentence should be set aside. As indicated below, we reject each of these arguments.

### A

The suggestion that no psychiatrist's testimony may be presented with respect to a defendant's future dangerousness is somewhat like asking us to disinvent the wheel. In the first place, it is contrary to our cases. If the likelihood of a defendant's committing further crimes is a constitutionally acceptable criterion for imposing the death penalty, which it is, *Jurek* v. *Texas*, 428 U. S. 262 (1976), and if it is not impossible for even a lay person sensibly to arrive at that conclu-

sion, it makes little sense, if any, to submit that psychiatrists, out of the entire universe of persons who might have an opinion on the issue, would know so little about the subject that they should not be permitted to testify. In *Jurek*, seven Justices rejected the claim that it was impossible to predict future behavior and that dangerousness was therefore an invalid consideration in imposing the death penalty. JUSTICES Stewart, POWELL, and STEVENS responded directly to the argument, *id.*, at 274–276:

> "It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. Any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. Texas law clearly assures that all such evidence will be adduced."

Although there was only lay testimony with respect to dangerousness in *Jurek*, there was no suggestion by the Court that the testimony of doctors would be inadmissable. To the contrary, the joint opinion announcing the judgment said that the jury should be presented with all of the relevant information. Furthermore, in *Estelle* v. *Smith*, 451 U. S. 454, 473

(1981), in the face of a submission very similar to that presented in this case with respect to psychiatric testimony, we approvingly repeated the above quotation from *Jurek* and went on to say that we were in "no sense disapproving the use of psychiatric testimony bearing on future dangerousness." See also *California* v. *Ramos, post,* at 1005–1006, 1009–1010, n. 23; *Gregg* v. *Georgia,* 428 U. S. 153, 203–204 (1976) (joint opinion) (desirable to allow open and far-ranging argument that places as much information as possible before the jury).

Acceptance of petitioner's position that expert testimony about future dangerousness is far too unreliable to be admissible would immediately call into question those other contexts in which predictions of future behavior are constantly made. For example, in *O'Connor* v. *Donaldson,* 422 U. S. 563, 576 (1975), we held that a nondangerous mental hospital patient could not be held in confinement against his will. Later, speaking about the requirements for civil commitments, we said:

> "There may be factual issues in a commitment proceeding, but the factual aspects represent only the beginning of the inquiry. Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington* v. *Texas,* 441 U. S. 418, 429 (1979).

In the second place, the rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party. Psychiatric testimony predicting dangerousness may be countered not only as erroneous in a particular case but also as generally so unreliable that it should be ignored. If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the

views of the State's psychiatrists along with opposing views of the defendant's doctors.[5]

Third, petitioner's view mirrors the position expressed in the *amicus* brief of the American Psychiatric Association (APA). As indicated above, however, the same view was presented and rejected in *Estelle* v. *Smith*. We are no more convinced now that the view of the APA should be converted into a constitutional rule barring an entire category of expert testimony.[6] We are not persuaded that such testimony is almost entirely unreliable and that the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings.

The *amicus* does not suggest that there are not other views held by members of the Association or of the profession generally. Indeed, as this case and others indicate, there are those doctors who are quite willing to testify at the sentencing hearing, who think, and will say, that they know what they are talking about, and who expressly disagree with the Association's point of view.[7] Furthermore, their

---

[5] In this case, no evidence was offered by petitioner at trial to contradict the testimony of Doctors Holbrook and Grigson. Nor is there a contention that, despite petitioner's claim of indigence, the court refused to provide an expert for petitioner. In cases of indigency, Texas law provides for the payment of $500 for "expenses incurred for purposes of investigation and expert testimony." Tex. Code Crim. Proc. Ann., Art. 26.05(d) (Vernon Supp. 1982).

[6] The federal cases cited in JUSTICE BLACKMUN's dissent as rejecting "scientific proof," *post*, at 931, n. 9, are not constitutional decisions, but decisions of federal evidence law. The question before us is whether the Constitution forbids exposing the jury or judge in a state criminal trial to the opinions of psychiatrists about an issue that JUSTICE BLACKMUN's dissent concedes the factfinders themselves are constitutionally competent to decide.

[7] At trial, Dr. Holbrook testified without contradiction that a psychiatrist could predict the future dangerousness of an individual, if given enough background information about the individual. Tr. of Trial (T. Tr.) 2072–2073. Dr. Grigson obviously held a similar view. See *id.*, at 2110, 2134. At the District Court hearing on the habeas petition, the State called two expert witnesses, Dr. George Parker, a psychologist, and Dr. Richard

qualifications as experts are regularly accepted by the courts. If they are so obviously wrong and should be discredited, there should be no insuperable problem in doing so by calling

Koons, a psychiatrist. Both of these doctors agreed that accurate predictions of future dangerousness can be made if enough information is provided; furthermore, they both deemed it highly likely that an individual fitting the characteristics of the one in the Barefoot hypothetical would commit future acts of violence. Tr. of Hearing (H. Tr.) 183–248.

Although Barefoot did not present any expert testimony at his trial, at the habeas hearing he called Dr. Fred Fason, a psychiatrist, and Dr. Wendell Dickerson, a psychologist. Dr. Fason did not dwell on the general ability of mental health professionals to predict future dangerousness. Instead, for the most part, he merely criticized the giving of a diagnosis based upon a hypothetical question, without an actual examination. He conceded that, if a medical student described a patient in the terms of the Barefoot hypothetical, his "highest order of suspicion," to the degree of 90%, would be that the patient had a sociopathic personality. *Id.*, at 22. He insisted, however, that this was only an "initial impression," and that no doctor should give a firm "diagnosis" without a full examination and testing. *Id.*, at 22, 29–30, 36. Dr. Dickerson, petitioner's other expert, was the only person to testify who suggested that no reliable psychiatric predictions of dangerousness could ever be made.

We are aware that many mental health professionals have questioned the usefulness of psychiatric predictions of future dangerousness in light of studies indicating that such predictions are often inaccurate. For example, at the habeas hearing, Dr. Dickerson, one of petitioner's expert witnesses, testified that psychiatric predictions of future dangerousness were wrong two out of three times. *Id.*, at 97, 108. He conceded, however, that, despite the high error rate, one "excellently done" study had shown "some predictive validity for predicting violence." *Id.*, at 96, 97. Dr. John Monahan, upon whom one of the State's experts relied as "the leading thinker on this issue," *id.*, at 195, concluded that "the 'best' clinical research currently in existence indicates that *psychiatrists and psychologists are accurate in no more than one out of three predictions of violent behavior over a several-year period among institutionalized populations that had both committed violence in the past . . . and who were diagnosed as mentally ill."* J. Monahan, The Clinical Prediction of Violent Behavior 47–49 (1981) (emphasis in original). However, although Dr. Monahan originally believed that it was impossible to predict violent behavior, by the time he had completed his monograph, he felt that "there may be circumstances in which prediction is both empirically possible and ethically

members of the Association who are of that view and who confidently assert that opinion in their *amicus* brief. Neither petitioner nor the Association suggests that psychiatrists are always wrong with respect to future dangerousness, only most of the time. Yet the submission is that this category of testimony should be excised entirely from all trials. We are unconvinced, however, at least as of now, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.

We are unaware of and have not been cited to any case, federal or state, that has adopted the categorical views of the Association.[8] Certainly it was presented and rejected at every

---

appropriate," and he hoped that his work would improve the appropriateness and accuracy of clinical predictions. *Id.*, at v.

All of these professional doubts about the usefulness of psychiatric predictions can be called to the attention of the jury. Petitioner's entire argument, as well as that of JUSTICE BLACKMUN's dissent, is founded on the premise that a jury will not be able to separate the wheat from the chaff. We do not share in this low evaluation of the adversary process.

[8] Petitioner relies on *People* v. *Murtishaw*, 29 Cal. 3d 733, 631 P. 2d 446 (1981). There the California Supreme Court held that in light of the general unreliability of such testimony, admitting medical testimony concerning future dangerousness was error in the context of a sentencing proceeding under the California capital punishment statutes. The court observed that "the testimony of [the psychiatrist was] not relevant to any of the listed factors" which the jury was to consider in deciding whether to impose the death penalty. *Id.*, at 771–772, 631 P. 2d, at 469. The court distinguished cases, however, where "the trier of fact is required by statute to determine whether a person is 'dangerous,'" in which event "expert prediction, unreliable though it may be, is often the only evidence available to assist the trier of fact." *Ibid.* Furthermore, the court acknowledged that "despite the recognized general unreliability of predictions concerning future violence, it may be possible for a party in a particular case to show that a reliable prediction is possible. . . . A reliable prediction might also be conceivable if the defendant had exhibited a long-continued pattern of criminal violence such that any knowledgeable psychiatrist would anticipate future violence." *Id.*, at 774, 631 P. 2d, at 470. Finally, we note

stage of the present proceeding. After listening to the two schools of thought testify not only generally but also about the petitioner and his criminal record, the District Court found:

> "The majority of psychiatric experts agree that where there is a pattern of repetitive assaultive and violent conduct, the accuracy of psychiatric predictions of future dangerousness dramatically rises. The accuracy of this conclusion is reaffirmed by the expert medical testimony in this case at the evidentiary hearing. . . . It would appear that Petitioner's complaint is not the diagnosis and prediction made by Drs. Holbrook and Grigson at the punishment phase of his trial, but that Dr. Grigson expressed extreme certainty in his diagnosis and prediction. . . . In any event, the differences among the experts were quantitative, not qualitative. The differences in opinion go to the weight [of the evidence] and not the admissibility of such testimony. . . . Such disputes are within the province of the jury to resolve. Indeed, it is a fundamental premise of our entire system of criminal jurisprudence that the purpose of the jury is to sort out the true testimony from the false, the important matters from the unimportant matters, and, when called upon to do so, to give greater credence to one party's expert witnesses than another's. Such matters occur routinely in the American judicial system, both civil and criminal." App. 13–14 (footnote omitted).

---

that the court did not in any way indicate that its holding was based on constitutional grounds.

Petitioner also relies on *White* v. *Estelle*, 554 F. Supp. 851 (SD Tex. 1982). The court in that case did no more than express "serious reservations" about the use of psychiatric predictions based on hypotheticals in instances where the doctor has had no previous contact with the defendant. *Id.*, at 858. The actual holding of the case, which is totally irrelevant to the issues here, was that the testimony of a doctor who *had* interviewed the defendant should have been excluded because, prior to the interview, the defendant had not been given *Miranda* warnings or an opportunity to consult with his attorney, as required by *Estelle* v. *Smith*, 451 U. S. 454 (1981).

We agree with the District Court, as well as with the Court of Appeals' judges who dealt with the merits of the issue and agreed with the District Court in this respect.

## B

Whatever the decision may be about the use of psychiatric testimony, in general, on the issue of future dangerousness, petitioner urges that such testimony must be based on personal examination of the defendant and may not be given in response to hypothetical questions. We disagree. Expert testimony, whether in the form of an opinion based on hypothetical questions or otherwise, is commonly admitted as evidence where it might help the factfinder do its assigned job. As the Court said long ago in *Spring Co.* v. *Edgar*, 99 U. S. 645, 657 (1879):

> "Men who have made questions of skill or science the object of their particular study, says Phillips, are competent to give their opinions in evidence. Such opinions ought, in general, to be deduced from facts that are not disputed, or from facts given in evidence; but the author proceeds to say that they need not be founded upon their own personal knowledge of such facts, but may be founded upon the statement of facts proved in the case. Medical men, for example, may give their opinions not only as to the state of a patient they may have visited, or as to the cause of the death of a person whose body they have examined, or as to the nature of the instruments which caused the wounds they have examined, but also in cases where they have not themselves seen the patient, and have only heard the symptoms and particulars of his state detailed by other witnesses at the trial. Judicial tribunals have in many instances held that medical works are not admissible, but they everywhere hold that men skilled in science, art, or particular trades may give their opinions as witnesses in matters pertaining to their professional calling."

See also *Dexter* v. *Hall*, 15 Wall. 9, 26–27 (1873); *Forsyth* v. *Doolittle*, 120 U. S. 73, 78 (1887); *Bram* v. *United States*, 168 U. S. 532, 568–569 (1897).

Today, in the federal system, Federal Rules of Evidence 702–706 provide for the testimony of experts. The Advisory Committee Notes touch on the particular objections to hypothetical questions, but none of these caveats lends any support to petitioner's constitutional arguments. Furthermore, the Texas Court of Criminal Appeals could find no fault with the mode of examining the two psychiatrists under Texas law:

> "The trial court did not err by permitting the doctors to testify on the basis of the hypothetical question. The use of hypothetical questions in the examination of expert witnesses is a well-established practice. 2 C. McCormick and R. Ray, Texas Evidence, § 1402 (2d ed. 1956). That the experts had not examined appellant went to the weight of their testimony, not to its admissibility." 596 S. W. 2d, at 887.

Like the Court of Criminal Appeals, the District Court, and the Court of Appeals, we reject petitioner's constitutional arguments against the use of hypothetical questions. Although cases such as this involve the death penalty, we perceive no constitutional barrier to applying the ordinary rules of evidence governing the use of expert testimony.

## C

As we understand petitioner, he contends that even if the use of hypothetical questions in predicting future dangerousness is acceptable as a general rule, the use made of them in his case violated his right to due process of law. For example, petitioner insists that the doctors should not have been permitted to give an opinion on the ultimate issue before the jury, particularly when the hypothetical questions

were phrased in terms of petitioner's own conduct;[9] that the hypothetical questions referred to controverted facts;[10] and that the answers to the questions were so positive as to be assertions of fact and not opinion.[11] These claims of misuse of the hypothetical questions, as well as others, were rejected by the Texas courts, and neither the District Court nor the Court of Appeals found any constitutional infirmity in the application of the Texas Rules of Evidence in this particular case. We agree.

## IV

In sum, we affirm the judgment of the District Court. There is no doubt that the psychiatric testimony increased the likelihood that petitioner would be sentenced to death, but this fact does not make that evidence inadmissible, any more than it would with respect to other relevant evidence

---

[9] There is support for this view in our cases, *United States* v. *Spaulding*, 293 U. S. 498, 506 (1935), but it does not appear from what the Court there said that the rule was rooted in the Constitution. In any event, we note that the Advisory Committee Notes to Rule 704 of the Federal Rules of Evidence state as follows:

"The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact. In order to render this approach fully effective and to allay any doubt on the subject, the so-called 'ultimate issue' rule is abolished by the instant rule." 28 U. S. C. App., p. 571.

[10] Nothing prevented petitioner from propounding a hypothetical to the doctors based on his own version of the facts. On cross-examination, both Drs. Holbrook and Grigson readily admitted that their opinions might change if some of the assumptions in the State's hypothetical were not true. T. Tr. 2104, 2132–2133.

[11] The more certain a State's expert is about his prediction, the easier it is for the defendant to impeach him. For example, in response to Dr. Grigson's assertion that he was "100% sure" that an individual with the characteristics of the one in the hypothetical would commit acts of violence in the future, Dr. Fason testified at the habeas hearing that if a doctor claimed to be 100% sure of something without examining the patient, "we would kick him off the staff of the hospital for his arrogance." H. Tr. 48. Similar testimony could have been presented at Barefoot's trial, but was not.

against any defendant in a criminal case. At bottom, to agree with petitioner's basic position would seriously undermine and in effect overrule *Jurek* v. *Texas*, 428 U. S. 262 (1976). Petitioner conceded as much at oral argument. Tr. of Oral Arg. 23–25. We are not inclined, however, to overturn the decision in that case.

The judgment of the District Court is

*Affirmed.*

JUSTICE STEVENS, concurring in the judgment.

For the reasons stated in Parts I and II of JUSTICE MARSHALL's dissenting opinion, I agree that the Court of Appeals made a serious procedural error in this case. Nevertheless, since this Court has now reviewed the merits of petitioner's appeal, and since I agree with the ultimate conclusion that the judgment of the District Court must be affirmed, I join the Court's judgment.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

I cannot subscribe to the Court's conclusion that the procedure followed by the Court of Appeals in this case was "not inconsistent with our cases." *Ante*, at 890. Nor can I accept the notion that it would be proper for a court of appeals to adopt special "summary procedures" for capital cases. *Ante*, at 894. On the merits, I would vacate petitioner's death sentence.

I

I wholeheartedly agree that when a state prisoner has obtained a certificate of probable cause to appeal from the denial of a petition for a writ of habeas corpus, he "must then be afforded an opportunity to address the merits, and the court of appeals is obligated to decide the merits of the appeal." *Ante*, at 893. A prisoner who has made the showing necessary to obtain a certificate of probable cause has satisfied the only condition that Congress has placed on the right to appeal

in habeas corpus cases.[1]  We have repeatedly held that once a certificate of probable cause has been granted, an appeal must be "duly considered"[2] and "disposed of on the merits"[3] by the court of appeals "in accord with its ordinary procedure."[4]

I likewise agree that "[a]pproving the execution of a defendant before his appeal is decided on the merits would clearly be improper," and that "a court of appeals, where necessary to prevent the case from becoming moot by the petitioner's execution, should grant a stay of execution pending disposition of [his] appeal." *Ante*, at 889, 893–894.  A prisoner's right to appeal would be meaningless if the State were allowed to execute him before his appeal could be considered and decided.   Although the question had not been decided by this Court until today, with the exception of the Fifth Circuit's rulings in this case and in *Brooks* v. *Estelle*, 697 F. 2d 586, stay and cert. before judgment denied, 459 U. S. 1061 (1982),[5] the Courts of Appeals have consistently held that a stay of execution must be granted unless it is clear that the

---

[1] Title 28 U. S. C. § 2253 provides that "[i]n a habeas corpus proceeding before a circuit or district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit where the proceeding is had," if the petitioner obtains a certificate of probable cause from "the justice or judge who rendered the order or a circuit justice or judge."

[2] *Carafas* v. *LaVallee*, 391 U. S. 234, 242 (1968).

[3] *Garrison* v. *Patterson*, 391 U. S. 464, 466 (1968) *(per curiam)*.

[4] *Nowakowski* v. *Maroney*, 386 U. S. 542, 543 (1967) *(per curiam)*.   See generally Blackmun, Allowance of In Forma Pauperis Appeals in § 2255 and Habeas Corpus Cases, 43 F. R. D. 343 (1967).

[5] While the Fifth Circuit followed a procedure in *Brooks* v. *Estelle* similar to that employed here, this Court's denial of Brooks' application for a stay and petition for certiorari before judgment does not constitute a precedent approving this procedure.   Denials of certiorari never have precedential value, see, *e. g.*, *Brown* v. *Allen*, 344 U. S. 443, 497 (1953); *Sunal* v. *Large*, 332 U. S. 174, 181 (1947); *House* v. *Mayo*, 324 U. S. 42, 48 (1945), and the denial of a stay can have no precedential value either since the Court's order did not discuss the standard that courts of appeals should apply in passing on an application for a stay pending appeal.

prisoner's appeal is entirely frivolous.   See, *e. g.*, *Goode* v. *Wainwright,* 670 F. 2d 941, 942 (CA11 1982); *Shaw* v. *Martin,* 613 F. 2d 487, 492 (CA4 1980) (Phillips, J.); *United States ex rel. DeVita* v. *McCorkle,* 214 F. 2d 823 (CA3 1954); *Fouquette* v. *Bernard,* 198 F. 2d 96, 97 (CA9 1952) (Denman, C. J.).[6]   This rule reflects a recognition of the simple fact that "[i]n the very nature of proceedings on a motion for stay of execution, the limited record coupled with the time constraints . . . preclude any fine-tuned inquiry into the actual merits." *Shaw* v. *Martin, supra,* at 492.

## II

Given the Court's acceptance of these basic principles, I frankly do not understand how the Court can conclude that the Court of Appeals' treatment of this case was "tolerable." *Ante,* at 892.   If, as the Court says, the Court of Appeals was "obligated to decide the merits of the appeal," *ante,* at 893, it most definitely failed to discharge that obligation, for the court never ruled on petitioner's appeal.   It is simply false to say that "the Court of Appeals ruled on the merits of the appeal." *Ante,* at 891.   The record plainly shows that the Court of Appeals did no such thing.   It neither dismissed the appeal as frivolous nor affirmed the judgment of the District Court.   The Court of Appeals made one ruling and one ruling only: it refused to stay petitioner's execution.   Had this Court not granted a stay, petitioner would have been put to death without his appeal ever having been decided one way or the other.

The Court is flatly wrong in suggesting that any defect was merely technical because the Court of Appeals could have "verif[ied] the obvious by expressly affirming the judgment

---

[6] Until its recent rulings the Fifth Circuit also followed this approach. See *United States ex rel. Goins* v. *Sigler,* 250 F. 2d 128, 129 (1957).

It has long been the rule that a death sentence imposed by a federal court will be stayed as a matter of course if the defendant takes an appeal. See Fed. Rule Crim. Proc. 38(a)(1) ("A sentence of death shall be stayed if an appeal is taken").

of the District Court" at the same time it denied a stay. *Ante*, at 891. The Court of Appeals' failure to decide petitioner's appeal was no oversight. The court simply had no authority to decide the appeal on the basis of the papers before it. In response to a question on this very point at oral argument, respondent expressly conceded that the Court of Appeals was in no position to affirm the District Court's judgment:

> "QUESTION: Do you think [the Court of Appeals] could as well have concluded that the judgment of the District Court should be affirmed?
> "MR. BECKER: No, sir . . . ." Tr. of Oral. Arg. 39.

Neither the Federal Rules of Appellate Procedure, nor the local rules of the Fifth Circuit, nor any decision of the Fifth Circuit, would have authorized an affirmance prior to the filing of briefs on the merits.[7]

Nor could the Court of Appeals have dismissed petitioner's appeal as frivolous. Although Rule 20 of the local rules of the Fifth Circuit permits dismissal of a frivolous appeal, petitioner's appeal was not subject to dismissal under this Rule for the simple reason—also conceded by the State at oral argument, Tr. of Oral Arg. 32—that it was *not* frivolous.

The Court of Appeals did not, because it could not, decide petitioner's appeal. What the court decided, and all that it decided, was that the likelihood of petitioner's prevailing on the merits was insufficient to justify the delay that would result from staying his execution pending the disposition of his

---

[7] See Tr. of Oral Arg. 41:

"QUESTION: [W]hy would you suggest it would be wrong for the Court of Appeals just to affirm?

"MR. BECKER: If that was their routine policy, I think they could.

"QUESTION: But it wasn't, was it?

"MR. BECKER: No, sir, it wasn't. . . ."

In the memorandum respondent filed in the Court of Appeals opposing a stay, there was no suggestion that the court was in a position to decide the appeal.

appeal.[8]   The question before us is whether this ruling was permissible, and it cannot be avoided by erroneously assuming that the Court of Appeals could have decided petitioner's appeal at the same time it denied a stay.

The very principles stated by the Court in Part II–B of its opinion provide the answer to this question.   Once a prisoner has obtained a certificate of probable cause to appeal, "the court of appeals is obligated to decide the merits of the appeal." *Ante,* at 893.   We have so held on no less than three separate occasions.   See *Garrison* v. *Patterson,* 391 U. S. 464, 466 (1968) *(per curiam); Carafas* v. *LaVallee,* 391 U. S. 234, 242 (1968); *Nowakowski* v. *Maroney,* 386 U. S. 542, 543 (1967) *(per curiam).*   As the Court also recognizes, *ante,* at 893–894, a court of appeals cannot fulfill this obligation if it permits the State to execute the prisoner before his appeal is decided.   "[I]f there is probable cause for the appeal it would be a mockery of federal justice to execute [the prisoner] pending its consideration." *Fouquette* v. *Bernard, supra,* at 97.

The Court's effort to reconcile the procedure followed by the Court of Appeals with these principles is based on an egregious misreading of *Garrison* v. *Patterson.*   *Ante,* at 891.   We explicitly stated in *Garrison* that "when a district court grants a certificate of probable cause the court of appeals must 'proceed to a disposition of the appeal in accord with its ordinary procedure.'"   391 U. S., at 466, quoting *Nowakowski* v. *Maroney, supra,* at 543.   In an attempt to avoid the obvious import of this statement, the Court quotes out of context a footnote in *Garrison* in which we stated that "[i]n an effort to determine whether the merits had been addressed" we had "solicited further submissions from the parties."   391 U. S., at 466, n. 2.   Even the most cursory examination of the opinion in *Garrison* shows why this footnote

---

[8] In reaching this conclusion, the Court of Appeals relied on cases involving stays in ordinary civil litigation in which the denial of a stay will not result in the execution of one of the litigants before his appeal can be decided.

provides no support whatsoever for the Court's conclusion that consideration of the merits in ruling on a stay makes an actual decision on the merits of an appeal unnecessary.

In *Garrison*, in contrast to this case, the Court of Appeals *did* decide the prisoner's appeal. It issued an order in which it granted a certificate of probable cause and in the next sentence affirmed the District Court's decision without explanation. *Id.*, at 465. To determine whether this was merely a *pro forma* decision unaccompanied by any real consideration of the issues, we solicited further submissions from the parties "to determine whether the merits had been addressed . . . at the unrecorded hearing" before the Court of Appeals. *Id.*, at 466, n. 2. Since the responses we received did not demonstrate that the Court of Appeals had actually considered the merits, *ibid.*, we reversed and remanded for further consideration of the appeal.

*Garrison* establishes that consideration of the merits is *necessary* to satisfy a court of appeals' statutory obligation. It in no way suggests, however, that consideration of the merits can ever be a *substitute* for an actual ruling on the appeal. *Garrison* held that the Court of Appeals had failed to discharge its statutory obligation even though it *did* decide the prisoner's appeal. This holding cannot be transformed into authority for the proposition that a court of appeals need not decide a prisoner's appeal at all if it considers the merits of the appeal in ruling on an interlocutory motion.

The Court offers no justification for the procedure followed by the Court of Appeals because there is none. A State has no legitimate interest in executing a prisoner before he has obtained full review of his sentence. A stay of execution pending appeal causes no harm to the State apart from the minimal burden of providing a jail cell for the prisoner for the period of time necessary to decide his appeal. By contrast, a denial of a stay on the basis of a hasty finding that the prisoner is not likely to succeed on his appeal permits the State to execute him prior to full review of a concededly substantial

constitutional challenge to his sentence. If the court's hurried evaluation of the appeal proves erroneous, as is entirely possible when difficult legal issues are decided without adequate time for briefing and full consideration, the execution of the prisoner will make it impossible to undo the mistake.

Once a federal judge has decided, as the District Judge did here, that a prisoner under sentence of death has raised a substantial constitutional claim, it is a travesty of justice to permit the State to execute him before his appeal can be considered and decided. If a prisoner's statutory right to appeal means anything, a State simply cannot be allowed to kill him and thereby moot his appeal.

## III

Not content with approving the precipitous procedure followed in this case, the Court also proceeds to suggest in Part II–B of its opinion that a court of appeals might properly adopt special "summary procedures" for "all or . . . selected cases in which a stay of a death sentence has been requested." *Ante,* at 894.

It is important to bear in mind that the Court's suggestion is directed at cases in which a certificate of probable cause to appeal has been granted *and* the court of appeals has concluded that the appeal is not frivolous.[9] If the prisoner had been sentenced to any punishment other than death, his appeal would therefore have been considered and decided in

---

[9] I agree with the Court that an appeal may be dismissed as frivolous only if it "is squarely foreclosed by statute, rule, or authoritative court decision, or is lacking any factual basis in the record." *Ante,* at 894. I would add that in view of the frequent changes in recent years in the law governing capital cases, see, *e. g., Bullington* v. *Missouri,* 451 U. S. 430 (1981) (distinguishing *Stroud* v. *United States,* 251 U. S. 15 (1919)); *Gardner* v. *Florida,* 430 U. S. 349 (1977) (distinguishing *Williams* v. *New York,* 337 U. S. 241 (1949)), the fact that an appeal challenges a holding of this Court does not make it frivolous if a plausible argument can be made that the decision in question has been called into question by later developments.

accord with the court of appeals' ordinary procedure. But since he has been sentenced to death, and since his scheduled date of execution is imminent, his appeal is to be decided under special truncated procedures. In short, an appeal that raises a substantial constitutional question is to be singled out for summary treatment *solely because the State has announced its intention to execute the appellant before the ordinary appellate procedure has run its course.*

This is truly a perverse suggestion. If full briefing and argument are generally regarded as necessary to fair and careful review of a nonfrivolous appeal—and they are—there is absolutely no justification for providing fewer procedural protections solely because a man's life is at stake. Given the irreversible nature of the death penalty, it would be hard to think of any class of cases for which summary procedures would be less appropriate than capital cases presenting a substantial constitutional issue.

The difference between capital cases and other cases is "the basis of differentiation in law in diverse ways," *Williams* v. *Georgia,* 349 U. S. 375, 391 (1955) (footnote omitted), but until today it had never been suggested, so far as I know, that *fewer* safeguards are required where life is at stake than where only liberty or property is at stake. This Court has always insisted that the need for procedural safeguards is particularly great where life is at stake. Long before the Court established the right to counsel in all felony cases, *Gideon* v. *Wainwright,* 372 U. S. 335 (1963), it recognized that right in capital cases, *Powell* v. *Alabama,* 287 U. S. 45, 71–72 (1932). Time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case. See, *e. g., Bullington* v. *Missouri,* 451 U. S. 430 (1981); *Beck* v. *Alabama,* 447 U. S. 625 (1980); *Green* v. *Georgia,* 442 U. S. 95 (1979) *(per curiam); Lockett* v. *Ohio,* 438 U. S. 586 (1978); *Gardner* v. *Florida,* 430 U. S. 349 (1977); *Woodson* v. *North Carolina,* 428 U. S. 280 (1976).

These decisions reflect an appreciation of the fundamental fact that

> "the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Id.*, at 305 (opinion of Stewart, POWELL, and STEVENS, JJ.) (footnote omitted).

Because of this basic difference between the death penalty and all other punishments, this Court has consistently recognized that there is "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Ibid.* See *Eddings* v. *Oklahoma*, 455 U. S. 104, 117–118 (1982) (O'CONNOR, J., concurring); *Beck* v. *Alabama, supra,* at 637–638; *Lockett* v. *Ohio, supra,* at 604-605 (plurality opinion).

By suggesting that special summary procedures might be adopted solely for capital cases, the majority turns this established approach on its head. Given that its suggestion runs contrary to this Court's repeated insistence on the particular need for reliability in capital cases, one would have expected some indication of why it might conceivably be appropriate to adopt such procedures. Instead, the suggestion is offered without explanation in a conclusory paragraph. In the entire majority opinion the only hint of a possible rationale is the Court's cryptic quotation of the following statement in *Lambert* v. *Barrett*, 159 U. S. 660, 662 (1895):

> "It is natural that counsel for the condemned in a capital case should lay hold of every ground which, in their judgment, might tend to the advantage of their client, but the administration of justice ought not to be interfered with on mere pretexts." Quoted, *ante*, at 888.

If, as the quotation of this statement suggests, the Court's approval of summary procedures rests on an assumption that appeals by prisoners under sentence of death are generally

frivolous, the conclusive answer is that this assumption is contrary to both law and fact.

It is contrary to law because we are dealing here with cases in which the federal judge most familiar with the case has concluded that a substantial constitutional claim is presented and in which the court of appeals has agreed that the appeal is not frivolous. It is contrary to fact because experience shows that prisoners on death row have succeeded in an extraordinary number of their appeals. Of the 34 capital cases decided on the merits by Courts of Appeals since 1976 in which a prisoner appealed from the denial of habeas relief, the prisoner has prevailed in no fewer than 23 cases, or approximately 70% of the time.[10] In the Fifth Circuit, of the 21 capital cases in which the prisoner was the appellant, the prisoner has prevailed in 15 cases.[11] This record establishes beyond any doubt that a very large proportion of federal habeas corpus appeals by prisoners on death row are meritorious, even though they present claims that have been unsuccessful in the state courts, that this Court in its discretion has decided not to review on certiorari, and that a federal district judge has rejected.

In view of the irreversible nature of the death penalty and the extraordinary number of death sentences that have been found to suffer from some constitutional infirmity, it would be grossly improper for a court of appeals to establish special summary procedures for capital cases. The only consolation I can find in today's decision is that the primary responsibility for selecting the appropriate procedures for these appeals lies, as the Court itself points out, *ante*, at 892, with the courts of appeals. Cf. *In re Burwell*, 350 U. S. 521, 522 (1956) *(per curiam)*. Notwithstanding the profoundly disturbing attitude reflected in today's opinion, I am hopeful that few circuit judges would ever support the adoption of

---

[10] See Brief for NAACP Legal Defense and Educational Fund, Inc., as *Amicus Curiae* 1e-6e.

[11] See *id.*, at 1e-4e.

procedures that would afford less consideration to an appeal in which a man's life is at stake than to an appeal challenging an ordinary money judgment.

## IV

Adhering to my view that the death penalty is under all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, see *Gregg* v. *Georgia*, 428 U. S. 153, 231 (1976) (MARSHALL, J., dissenting); *Furman* v. *Georgia*, 408 U. S. 238, 358–369 (1972) (MARSHALL, J., concurring), I would vacate petitioner's death sentence.

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join as to Parts I–IV, dissenting.

I agree with most of what JUSTICE MARSHALL has said in his dissenting opinion. I, too, dissent, but I base my conclusion also on evidentiary factors that the Court rejects with some emphasis. The Court holds that psychiatric testimony about a defendant's future dangerousness is admissible, despite the fact that such testimony is wrong two times out of three. The Court reaches this result—even in a capital case—because, it is said, the testimony is subject to cross-examination and impeachment. In the present state of psychiatric knowledge, this is too much for me. One may accept this in a routine lawsuit for money damages, but when a person's life is at stake—no matter how heinous his offense—a requirement of greater reliability should prevail. In a capital case, the specious testimony of a psychiatrist, colored in the eyes of an impressionable jury by the inevitable untouchability of a medical specialist's words, equates with death itself.

## I

To obtain a death sentence in Texas, the State is required to prove beyond a reasonable doubt that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex.

Code Crim. Proc. Ann., Art. 37.071(b)(2) (Vernon 1981). As a practical matter, this prediction of future dangerousness was the only issue to be decided by Barefoot's sentencing jury.[1]

At the sentencing hearing, the State established that Barefoot had two prior convictions for drug offenses and two prior convictions for unlawful possession of firearms. None of these convictions involved acts of violence. At the guilt stage of the trial, for the limited purpose of establishing that the crime was committed in order to evade police custody, see *Barefoot* v. *State*, 596 S. W. 2d 875, 886–887 (Tex. Crim. App. 1980), cert. denied, 453 U. S. 913 (1981), the State had presented evidence that Barefoot had escaped from jail in New Mexico where he was being held on charges of statutory rape and unlawful restraint of a minor child with intent to commit sexual penetration against the child's will. The prosecution also called several character witnesses at the sentencing hearing, from towns in five States. Without mentioning particular examples of Barefoot's conduct, these witnesses testified that Barefoot's reputation for being a peaceable and law-abiding citizen was bad in their respective communities.

Last, the prosecution called Doctors Holbrook and Grigson, whose testimony extended over more than half the hearing. Neither had examined Barefoot or requested the opportunity to examine him. In the presence of the jury, and over defense counsel's objection, each was qualified as an expert psychiatrist witness. Doctor Holbrook detailed at length his training and experience as a psychiatrist, which included a position as chief of psychiatric services at the Texas

---

[1] It appears that every person convicted of capital murder in Texas will satisfy the other requirement relevant to Barefoot's sentence, that "the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result," Tex. Code Crim. Proc. Ann., Art. 37.071(b)(1) (Vernon 1981), because a capital murder conviction requires a finding that the defendant "intentionally or knowingly cause[d] the death of an individual," see Tex. Penal Code Ann. § 19.02(a)(1) (Vernon 1974); see also § 19.03(a).

Department of Corrections.   He explained that he had previously performed many "criminal evaluations," Trial Tr. 2069, and that he subsequently took the post at the Department of Corrections to observe the subjects of these evaluations so that he could "be certain those opinions that [he] had were accurate at the time of trial and pretrial." *Id.*, at 2070.   He then informed the jury that it was "within [his] *capacity as a doctor of psychiatry* to predict the future dangerousness of an individual within a *reasonable medical certainty*," *id.*, at 2072 (emphasis supplied), and that he could give *"an expert medical opinion* that would be *within reasonable psychiatric certainty* as to whether or not that individual would be dangerous to the degree that there would be a probability that that person would commit criminal acts of violence in the future that would constitute a continuing threat to society," *id.*, at 2073 (emphasis supplied).

Doctor Grigson also detailed his training and medical experience, which, he said, included examination of "between thirty and forty thousand individuals," including 8,000 charged with felonies, and at least 300 charged with murder. *Id.*, at 2109.   He testified that with enough information he would be able to "give *a medical opinion within reasonable psychiatric certainty* as to the psychological or psychiatric makeup of an individual," *id.*, at 2110 (emphasis supplied), and that this skill was "particular to the field of psychiatry and not to the average layman." *Id.*, at 2111.

Each psychiatrist then was given an extended hypothetical question asking him to assume as true about Barefoot the four prior convictions for nonviolent offenses, the bad reputation for being law-abiding in various communities, the New Mexico escape, the events surrounding the murder for which he was on trial and, in Doctor Grigson's case, the New Mexico arrest.   On the basis of the hypothetical question, Doctor Holbrook diagnosed Barefoot "within a reasonable psychiatr[ic] certainty," as a "criminal sociopath." *Id.*, at 2097. He testified that he knew of no treatment that could change

this condition, and that the condition would not change for the better but "may become accelerated" in the next few years. *Id.*, at 2100. Finally, Doctor Holbrook testified that, "within reasonable psychiatric certainty," there was "a probability that the Thomas A. Barefoot in that hypothetical will commit criminal acts of violence in the future that would constitute a continuing threat to society," and that his opinion would not change if the "society" at issue was that within Texas prisons rather than society outside prison. *Id.*, at 2100–2101.

Doctor Grigson then testified that, on the basis of the hypothetical question, he could diagnose Barefoot "within reasonable psychiatric certainty" as an individual with "a fairly classical, typical, sociopathic personality disorder." *Id.*, at 2127–2128. He placed Barefoot in the "most severe category" of sociopaths (on a scale of one to ten, Barefoot was "above ten"), and stated that there was no known cure for the condition. *Id.*, at 2129. Finally, Doctor Grigson testified that whether Barefoot was in society at large or in a prison society there was a *"one hundred percent and absolute"* chance that Barefoot would commit future acts of criminal violence that would constitute a continuing threat to society. *Id.*, at 2131 (emphasis supplied).

On cross-examination, defense counsel questioned the psychiatrists about studies demonstrating that psychiatrists' predictions of future dangerousness are inherently unreliable. Doctor Holbrook indicated his familiarity with many of these studies but stated that he disagreed with their conclusions. Doctor Grigson stated that he was not familiar with most of these studies, and that their conclusions were accepted by only a "small minority group" of psychiatrists— "[i]t's not the American Psychiatric Association that believes that." *Id.*, at 2134.

After an hour of deliberation, the jury answered "yes" to the two statutory questions, and Thomas Barefoot was sentenced to death.

## II

### A

The American Psychiatric Association (APA), participating in this case as *amicus curiae*, informs us that "[t]he unreliability of psychiatric predictions of long-term future dangerousness is by now an established fact within the profession." Brief for American Psychiatric Association as *Amicus Curiae* 12 (APA Brief). The APA's best estimate is that *two out of three* predictions of long-term future violence made by psychiatrists are wrong. *Id.*, at 9, 13. The Court does not dispute this proposition, see *ante*, at 899–901, n. 7, and indeed it could not do so; the evidence is overwhelming. For example, the APA's Draft Report of the Task Force on the Role of Psychiatry in the Sentencing Process (1983) (Draft Report) states that "[c]onsiderable evidence has been accumulated by now to demonstrate that long-term prediction by psychiatrists of future violence is an extremely inaccurate process." *Id.*, at 29. John Monahan, recognized as "the leading thinker on this issue" even by the State's expert witness at Barefoot's federal habeas corpus hearing, Hearing Tr. 195, concludes that "the 'best' clinical research currently in existence indicates that psychiatrists and psychologists are accurate in no more than one out of three predictions of violent behavior," even among populations of individuals who are mentally ill and have committed violence in the past. J. Monahan, The Clinical Prediction of Violent Behavior 47–49 (1981) (emphasis deleted) (J. Monahan, Clinical Prediction); see also *id.*, at 6–7, 44–50. Another study has found it impossible to identify any subclass of offenders "whose members have a greater-than-even chance of engaging again in an assaultive act." Wenk, Robison, & Smith, Can Violence Be Predicted?, 18 Crime & Delinquency 393, 394 (1972). Yet another commentator observes: "In general, mental health professionals . . . are more likely to be wrong than right when they predict legally relevant behavior. When predicting violence, dangerousness, and suicide, they are far more

likely to be wrong than right." Morse, Crazy Behavior, Morals, and Science: An Analysis of Mental Health Law, 51 S. Cal. L. Rev. 527, 600 (1978) (Morse, Analysis of Mental Health Law). Neither the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right.[2]

The APA also concludes, see APA Brief 9–16, as do researchers that have studied the issue,[3] that psychiatrists simply have no expertise in predicting long-term future dan-

---

[2] Among the many other studies reaching this conclusion are APA Task Force Report, Clinical Aspects of the Violent Individual 28 (1974) (90% error rate "[u]nfortunately . . . is the state of the art") (APA, Clinical Aspects); Steadman & Morrissey, The Statistical Prediction of Violent Behavior, 5 Law & Human Behavior 263, 271–273 (1981); Dix, Expert Prediction Testimony in Capital Sentencing: Evidentiary and Constitutional Considerations, 19 Am. Crim. L. Rev. 1, 16 (1981); Schwitzgebel, Prediction of Dangerousness and Its Implications for Treatment, in W. Curran, A. McGarry, & C. Petty, Modern Legal Medicine, Psychiatry, and Forensic Science 783, 784–786 (1980); Cocozza & Steadman, Prediction in Psychiatry: An Example of Misplaced Confidence in Experts, 25 Soc. Probs. 265, 272–273 (1978); Report of the (American Psychological Association's) Task Force on the Role of Psychology in the Criminal Justice System, 33 Am. Psychologist 1099, 1110 (1978); Steadman & Cocozza, Psychiatry, Dangerousness and the Repetitively Violent Offender, 69 J. Crim. L. & Criminology 226, 227, 230 (1978); Cocozza & Steadman, The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence, 29 Rutgers L. Rev. 1084, 1101 (1976); Diamond, The Psychiatric Prediction of Dangerousness, 123 U. Pa. L. Rev. 439, 451–452 (1974); Ennis & Litwack, Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom, 62 Calif. L. Rev. 693, 711–716 (1974). A relatively early study making this point is Rome, Identification of the Dangerous Offender, 42 F. R. D. 185 (1968).

[3] See, e. g., APA, Clinical Aspects 28; 1 J. Ziskin, Coping with Psychiatric and Psychological Testimony 11, 19 (3d ed. 1981); Steadman & Morrissey, supra n. 2, at 264; Morse, Analysis of Mental Health Law, 51 S. Cal. L. Rev., at 599–600, 619–622; Cocozza & Steadman, supra n. 2, 25 Soc. Probs., at 274–275; Cocozza & Steadman, supra n. 2, 29 Rutgers L. Rev., at 1099–1100.

gerousness. A layman with access to relevant statistics can do at least as well and possibly better; psychiatric training is not relevant to the factors that validly can be employed to make such predictions, and psychiatrists consistently err on the side of overpredicting violence.[4] Thus, while Doctors Grigson and Holbrook were presented by the State and by self-proclamation as experts at predicting future dangerousness, the scientific literature makes crystal clear that they had no expertise whatever. Despite their claims that they were able to predict Barefoot's future behavior "within reasonable psychiatric certainty," or to a "one hundred percent and absolute" certainty, there was in fact no more than a one in three chance that they were correct.[5]

---

[4] See APA Brief 14–16; APA, Clinical Aspects 25; J. Monahan, Clinical Prediction 86; Morse, Analysis of Mental Health Law, 51 S. Cal. L. Rev., at 598–600; Steadman & Cocozza, *supra* n. 2, 69 J. Crim. L. & Criminology, at 229–230; Diamond, *supra* n. 2, at 447.

That psychiatrists actually may be less accurate predictors of future violence than laymen, Ennis & Litwack, *supra* n. 2, at 734–735, may be due to personal biases in favor of predicting violence arising from the fear of being responsible for the erroneous release of a violent individual, see J. Monahan, Clinical Prediction 13, 22–25, 86; Morse, Analysis of Mental Health Law, 51 S. Cal. L. Rev., at 598–600. It also may be due to a tendency to generalize from experiences with past offenders on bases that have no empirical relationship to future violence, see Shah, Dangerousness: A Paradigm for Exploring Some Issues in Law and Psychology, American Psychologist 224, 229–230 (Mar. 1978), a tendency that may be present in Grigson's and Holbrook's testimony. Statistical prediction is clearly more reliable than clinical prediction, J. Monahan, Clinical Prediction 82; Steadman & Morrissey, *supra* n. 2, at 272—and prediction based on statistics alone may be done by anyone, Morse, Analysis of Mental Health Law, 51 S. Cal. L. Rev., at 599–600; APA Brief 15–16.

[5] Like the District Court, App. 13, and the Court of Appeals, *id.*, at 20, the Court seeks to justify the admission of psychiatric testimony on the ground that " '[t]he majority of psychiatric experts agree that where there is a pattern of repetitive assaultive and violent conduct, the accuracy of psychiatric predictions of future dangerousness dramatically rises.' " *Ante*, at 902, quoting App. 13. The District Court correctly found that there

## B

It is impossible to square admission of this purportedly scientific but actually baseless testimony with the Constitution's paramount concern for reliability in capital sentencing.[6]

---

is empirical evidence supporting the common-sense correlation between repetitive past violence and future violence; the APA states that "[t]he *most* that can be said about any individual is that a history of past violence increases the probability that future violence will occur." Draft Report 29 (emphasis supplied). But psychiatrists have no special insights to add to this actuarial fact, and a single violent crime cannot provide a basis for a reliable prediction of future violence. APA, Clinical Aspects 23–24; see J. Monahan, Clinical Prediction 71–72; Steadman & Cocozza, *supra* n. 2, 69 J. Crim. L. & Criminology, at 229–230.

The lower courts and this Court have sought solace in this statistical correlation without acknowledging its obvious irrelevance to the facts of this case. The District Court did not find that the State demonstrated any pattern of repetitive assault and violent conduct by Barefoot. Recognizing the importance of giving some credibility to its experts' specious prognostications, the State now claims that the "reputation" testimony adduced at the sentencing hearing "can only evince repeated, widespread acts of criminal violence." Brief for Respondent 47. This is simply absurd. There was no testimony worthy of credence that Barefoot had committed acts of violence apart from the crime for which he was being tried; there was testimony only of a bad *reputation* for peaceable and law-abiding conduct. In light of the fact that each of Barefoot's prior convictions was for a nonviolent offense, such testimony obviously could have been based on antisocial but nonviolent behavior. Neither psychiatrist informed the jury that he considered this reputation testimony to show a history of repeated acts of violence. Moreover, if the psychiatrists or the jury were to rely on such vague hearsay testimony in order to show a "pattern of repetitive assault and violent conduct," Barefoot's death sentence would rest on information that might "bear no closer relation to fact than the average rumor or item of gossip," *Gardner* v. *Florida,* 430 U. S. 349, 359 (1977), and should be invalid for that reason alone. A death sentence cannot rest on highly dubious predictions secretly based on a factual foundation of hearsay and pure conjecture. See *ibid.*

[6] Although I believe that the misleading nature of any psychiatric prediction of future violence violates due process when introduced in a capital sentencing hearing, admitting the predictions in this case—which were made without even examining the defendant—was particularly indefensi-

Death is a permissible punishment in Texas only if the jury finds beyond a reasonable doubt that there is a probability the defendant will commit future acts of criminal violence. The admission of unreliable psychiatric predictions of future violence, offered with unabashed claims of "reasonable medical certainty" or "absolute" professional reliability, creates an intolerable danger that death sentences will be imposed erroneously.

The plurality in *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976), stated:

> "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."

The Court does not see fit to mention this principle today, yet it is as firmly established as any in our Eighth Amendment jurisprudence. Only two weeks ago, in *Zant* v. *Stephens*, 462 U. S. 862, 884 (1983), the Court described the need for reliability in the application of the death penalty as one of the

---

ble. In the APA's words, if prediction following even an in-depth examination is inherently unreliable,

"there is all the more reason to shun the practice of testifying without having examined the defendant at all. . . . Needless to say, responding to hypotheticals is just as fraught with the possibility of error as testifying in any other way about an individual whom one has not personally examined. Although the courts have not yet rejected the practice, psychiatrists should." Draft Report 32–33.

Such testimony is offensive not only to legal standards; the APA has declared that "[i]t is unethical for a psychiatrist to offer a professional opinion unless he/she has conducted an examination." The Principles of Medical Ethics, With Annotations Especially Applicable to Psychiatry § 7(3), p. 9 (1981); see Opinions of the Ethics Committee on the Principles of Medical Ethics, With Annotations Especially Applicable to Psychiatry, p. 27 (1983). The Court today sanctions admission in a capital sentencing hearing of "expert" medical testimony so unreliable and unprofessional that it violates the canons of medical ethics.

basic "themes . . . reiterated in our opinions discussing the procedures required by the Constitution in capital sentencing determinations." See *Eddings* v. *Oklahoma*, 455 U. S. 104, 110–112 (1982) (capital punishment must be "imposed fairly, and with reasonable consistency, or not at all"); *id.*, at 118–119 (O'CONNOR, J., concurring); *Beck* v. *Alabama*, 447 U. S. 625, 637–38, and n. 13 (1980); *Green* v. *Georgia*, 442 U. S. 95, 97 (1979); *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion); *Gardner* v. *Florida*, 430 U. S. 349, 359 (1977) (plurality opinion); *id.*, at 363–364 (WHITE, J., concurring in judgment). State evidence rules notwithstanding, it is well established that, because the truth-seeking process may be unfairly skewed, due process may be violated even in a noncapital criminal case by the exclusion of evidence probative of innocence, see *Chambers* v. *Mississippi*, 410 U. S. 284 (1973), or by the admission of certain categories of unreliable and prejudicial evidence, see *Watkins* v. *Sowders*, 449 U. S. 341, 347 (1981) ("[i]t is the reliability of identification evidence that primarily determines its admissibility"); *Foster* v. *California*, 394 U. S. 440 (1969).[7] The reliability and admissibility of evidence considered by a capital sentencing factfinder is obviously of still greater constitutional concern. Cf. *Green* v. *Georgia*, 442 U. S. 95 (1979); *Gardner* v. *Florida*, 430 U. S. 349 (1977).

The danger of an unreliable death sentence created by this testimony cannot be brushed aside on the ground that the "'jury [must] have before it all possible relevant information about the individual defendant whose fate it must determine.'" *Ante*, at 897, quoting *Jurek* v. *Texas*, 428 U. S. 262, 276 (1976) (joint opinion announcing the judgment). Although committed to allowing a "wide scope of evidence" at presentence hearings, *Zant* v. *Stephens*, 462 U. S., at 886,

---

[7] Cf. *Stein* v. *New York*, 346 U. S. 156, 192 (1953) (prior to application of Fifth Amendment to the States, "reliance on a coerced confession vitiate[d] a [state] conviction because such a confession combines the persuasiveness of apparent conclusiveness with what judicial experience shows to be illusory and deceptive evidence").

the Court has recognized that "consideration must be given to the quality, as well as the quantity, of the information on which the sentencing [authority] may rely." *Gardner* v. *Florida,* 430 U. S., at 359. Thus, very recently, this Court reaffirmed a crucial limitation on the permissible scope of evidence: "'[s]o long as the evidence introduced . . . do[es] not *prejudice* a defendant, it is preferable not to impose restrictions.'" *Zant* v. *Stephens,* 462 U. S., at 886, quoting *Gregg* v. *Georgia,* 428 U. S. 153, 203–204 (1976) (emphasis supplied). The Court all but admits the obviously prejudicial impact of the testimony of Doctors Grigson and Holbrook; granting that their absolute claims were more likely to be wrong than right, *ante,* at 899, n. 7, 901, the Court states that "[t]here is no doubt that the psychiatric testimony increased the likelihood that petitioner would be sentenced to death," *ante,* at 905.

Indeed, unreliable scientific evidence is widely acknowledged to be prejudicial. The reasons for this are manifest. "The major danger of scientific evidence is its potential to mislead the jury; an aura of scientific infallibility may shroud the evidence and thus lead the jury to accept it without critical scrutiny." Giannelli, The Admissibility of Novel Scientific Evidence: *Frye* v. *United States,* a Half-Century Later, 80 Colum. L. Rev. 1197, 1237 (1980) (Giannelli, Scientific Evidence).[8] Where the public holds an exaggerated opinion of

---

[8] There can be no dispute about this obvious proposition:

"Scientific evidence impresses lay jurors. They tend to assume it is more accurate and objective than lay testimony. A juror who thinks of scientific evidence visualizes instruments capable of amazingly precise measurement, of findings arrived at by dispassionate scientific tests. In short, in the mind of the typical lay juror, a scientific witness has a special aura of credibility." Imwinkelried, Evidence Law and Tactics for the Proponents of Scientific Evidence, in Scientific and Expert Evidence 33, 37 (E. Imwinkelried ed. 1981).

See 22 C. Wright & K. Graham, Federal Practice and Procedure § 5217, p. 295 (1978) ("Scientific . . . evidence has great potential for misleading the jury. The low probative worth can often be concealed in the jargon of

the accuracy of scientific testimony, the prejudice is likely to be indelible. See *United States* v. *Baller*, 519 F. 2d 463, 466 (CA4), cert. denied, 423 U. S. 1019 (1975). There is little question that psychiatrists are perceived by the public as having a special expertise to predict dangerousness, a perception based on psychiatrists' study of mental disease. See J. Robitscher, The Powers of Psychiatry 187–188 (1980); Cocozza & Steadman, *supra* n. 2, 25 Soc. Probs., at 273; Morse, Analysis of Mental Health Law, 51 S. Cal. L. Rev., at 533–536. It is this perception that the State in Barefoot's case sought to exploit. Yet mental disease is not correlated with violence, see J. Monahan, Clinical Prediction 77–82; Steadman & Cocozza, *supra* n. 2, 69 J. Crim. L. & Criminology, at 230, and the stark fact is that no such expertise exists. Moreover, psychiatrists, it is said, sometimes attempt to perpetuate this illusion of expertise, Cocozza & Steadman, *supra* n. 2, 25 Soc. Probs., at 274, and Doctors Grigson and Holbrook—who purported to be able to predict future dangerousness "within reasonable psychiatric certainty," or absolutely—present extremely disturbing exam-

---

some expert . . ."). This danger created by use of scientific evidence frequently has been recognized by the courts. Speaking specifically of psychiatric predictions of future dangerousness similar to those at issue, one District Court has observed that when such a prediction "is proffered by a witness bearing the title of 'Doctor,' its impact on the jury is much greater than if it were not masquerading as something it is not." *White* v. *Estelle*, 554 F. Supp. 851, 858 (SD Tex. 1982). See Note—*People* v. *Murtishaw: Applying the Frye Test to Psychiatric Predictions of Dangerousness in Capital Cases*, 70 Calif. L. Rev. 1069, 1076–1077 (1982). In *United States* v. *Addison*, 162 U. S. App. D. C. 199, 202, 498 F. 2d 741, 744 (1974), the court observed that scientific evidence may "assume a posture of mystic infallibility in the eyes of a jury of laymen." Another court has noted that scientific evidence "is likely to be shrouded with an aura of near infallibility, akin to the ancient oracle of Delphi." *United States* v. *Alexander*, 526 F. 2d 161, 168 (CA8 1975). See *United States* v. *Amaral*, 488 F. 2d 1148, 1152 (CA9 1973); *United States* v. *Wilson*, 361 F. Supp. 510, 513 (Md. 1973); *People* v. *King*, 266 Cal. App. 2d 437, 461, 72 Cal. Rptr. 478, 493 (1968).

ples of this tendency. The problem is not uncommon. See Giannelli, Scientific Evidence, 80 Colum. L. Rev., at 1238.

Furthermore, as is only reasonable, the Court's concern in encouraging the introduction of a wide scope of evidence has been to ensure that *accurate* information is provided to the sentencing authority without restriction. The joint opinion announcing the judgment in *Gregg* explained the jury's need for relevant evidence in these terms:

> "If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for *accurate* information . . . to be able to impose a rational sentence in the typical criminal case, then *accurate* sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision." 428 U. S., at 190 (emphasis supplied).

See *California* v. *Ramos, post,* at 1004 (Court holds jury instruction permissible at sentencing hearing on ground that it "gives the jury *accurate* information") (emphasis supplied). So far as I am aware, the Court never has suggested that there is any interest in providing deceptive and inaccurate testimony to the jury.

Psychiatric predictions of future dangerousness *are not accurate;* wrong two times out of three, their probative value, and therefore any possible contribution they might make to the ascertainment of truth, is virtually nonexistent. See Cocozza & Steadman, *supra* n. 2, 29 Rutgers L. Rev., at 1101 (psychiatric testimony not sufficiently reliable to support finding that individual will be dangerous under any standard of proof). Indeed, given a psychiatrist's prediction that an individual will be dangerous, it is more likely than not that the defendant will *not* commit further violence. It is difficult to understand how the admission of such predictions can be justified as advancing the search for truth, particularly in light of their clearly prejudicial effect.

Thus, the Court's remarkable observation that "[n]either petitioner nor the [APA] suggests that psychiatrists are *always wrong* with respect to future dangerousness, *only most of the time*," *ante*, at 901 (emphasis supplied), misses the point completely, and its claim that this testimony was no more problematic than "other relevant evidence against any defendant in a criminal case," *ante*, at 905–906, is simply incredible. Surely, this Court's commitment to ensuring that death sentences are imposed reliably and reasonably requires that nonprobative and highly prejudicial testimony on the ultimate question of life or death be excluded from a capital sentencing hearing.

### III

### A

Despite its recognition that the testimony at issue was probably wrong and certainly prejudicial, the Court holds this testimony admissible because the Court is "unconvinced . . . that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness." *Ante*, at 901; see *ante*, at 899–901, n. 7. One can only wonder how juries are to separate valid from invalid expert opinions when the "experts" themselves are so obviously unable to do so. Indeed, the evidence suggests that juries are not effective at assessing the validity of scientific evidence. Giannelli, Scientific Evidence, 80 Colum. L. Rev., at 1239–1240, and n. 319.

There can be no question that psychiatric predictions of future violence will have an undue effect on the ultimate verdict. Even judges tend to accept psychiatrists' recommendations about a defendant's dangerousness with little regard for cross-examination or other testimony. Cocozza & Steadman, *supra* n. 2, 25 Soc. Probs., at 271 (in making involuntary commitment decisions, psychiatric predictions of future dangerousness accepted in 86.7% of cases); see Morse, Analysis of Mental Health Law, 51 S. Cal. L. Rev., at 536, n. 16, 603. There is every reason to believe that inexperienced

jurors will be still less capable of "separat[ing] the wheat from the chaff," despite the Court's blithe assumption to the contrary, *ante*, at 901, n. 7. The American Bar Association has warned repeatedly that sentencing juries are particularly incapable of dealing with information relating to "the likelihood that the defendant will commit other crimes," and similar predictive judgments. ABA Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 1.1(b), Commentary, pp. 46–47 (App. Draft 1968); ABA Standards for Criminal Justice 18–1.1, Commentary, pp. 18·16, 18·24 to 18·25 (2d ed. 1980). Relying on the ABA's conclusion, the joint opinion announcing the judgment in *Gregg* v. *Georgia*, 428 U. S., at 192, recognized that "[s]ince the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." But the Court in this case, in its haste to praise the jury's ability to find the truth, apparently forgets this well-known and worrisome shortcoming.

As if to suggest that petitioner's position that unreliable expert testimony should be excluded is unheard of in the law, the Court relies on the proposition that the rules of evidence generally "anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party." *Ante*, at 898. But the Court simply ignores hornbook law that, despite the availability of cross-examination and rebuttal witnesses, "opinion evidence is not admissible if the court believes that the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted." E. Cleary, McCormick on Evidence § 13, p. 31 (2d ed. 1972). Because it is feared that the jury will overestimate its probative value, polygraph evidence, for example, almost invariably is excluded from trials despite the fact that, at a conservative estimate, an experienced polygraph examiner can detect truth or deception correctly about 80 to 90 percent of the time. Ennis & Litwack,

*supra* n. 2, at 736.[9]    In no area is purportedly "expert" testimony admitted for the jury's consideration where it cannot be demonstrated that it is correct more often than not.    "It is inconceivable that a judgment could be considered an 'expert' judgment when it is less accurate than the flip of a coin." *Id.*, at 737.    The risk that a jury will be incapable of separating "scientific" myth from reality is deemed unacceptably high.[10]

### B

The Constitution's mandate of reliability, with the stakes at life or death, precludes reliance on cross-examination and the opportunity to present rebuttal witnesses as an antidote for this distortion of the truth-finding process.    Cross-examination is unlikely to reveal the fatuousness of psychi-

[9] Other purportedly scientific proof has met a similar fate.    See, *e. g.*, *United States* v. *Kilgus*, 571 F. 2d 508, 510 (CA9 1978) (expert testimony identifying aircraft through "forward looking infrared system" inadmissible because unreliable and not generally accepted in scientific field to which it belongs); *United States* v. *Brown*, 557 F. 2d 541, 558–559 (CA6 1977) (expert identification based on "ion microprobic analysis of human hair" not admissible because insufficiently reliable and accurate, and not accepted in its field); *United States* v. *Addison*, 162 U. S. App. D. C., at 203, 498 F. 2d, at 745 (expert identification based on voice spectrogram inadmissible because not shown reliable); *United States* v. *Hearst*, 412 F. Supp. 893, 895 (ND Cal. 1976) (identification testimony of expert in "psycholinguistics" inadmissible because not demonstrably reliable), aff'd on other grounds, 563 F. 2d 1331 (CA9 1977).

[10] The Court observes that this well-established rule is a matter of evidence law, not constitutional law.    *Ante*, at 899, n. 6.    But the principle requiring that capital sentencing procedures ensure reliable verdicts, see *supra*, at 923–926, which the Court ignores, and the principle that due process is violated by the introduction of certain types of seemingly conclusive, but actually unreliable, evidence, see *supra*, at 925, and n. 7, which the Court also ignores, are constitutional doctrines of long standing.    The teaching of the evidence doctrine is that unreliable scientific testimony creates a serious and unjustifiable risk of an erroneous verdict, and that the adversary process at its best does not remove this risk.    We should not dismiss this lesson merely by labeling the doctrine nonconstitutional; its relevance to the constitutional question before the Court could not be more certain.

atric predictions because such predictions often rest, as was the case here, on psychiatric categories and intuitive clinical judgments not susceptible to cross-examination and rebuttal. Dix, *supra* n. 2, at 44. Psychiatric categories have little or no demonstrated relationship to violence, and their use often obscures the unimpressive statistical or intuitive bases for prediction. J. Monahan, Clinical Prediction 31; Cocozza & Steadman, *supra* n. 2, 25 Soc. Probs., at 274.[11] The APA particularly condemns the use of the diagnosis employed by Doctors Grigson and Holbrook in this case, that of sociopathy:

> "In this area confusion reigns. The psychiatrist who is not careful can mislead the judge or jury into believing that a person has a major mental disease simply on the basis of a description of prior criminal behavior. Or a psychiatrist can mislead the court into believing that an individual is devoid of conscience on the basis of a description of criminal acts alone. . . . The profession of psychiatry has a responsibility to avoid inflicting this confusion upon the courts and to spare the defendant the harm that may result. . . . Given our uncertainty about the implications of the finding, the diagnosis of sociopathy . . . should not be used to justify or to support predictions of future conduct. There is no certainty in this area." Draft Report 30.

It is extremely unlikely that the adversary process will cut through the facade of superior knowledge. THE CHIEF JUSTICE long ago observed:

[11] In one study, for example, the only factor statistically related to whether psychiatrists predicted that a subject would be violent in the future was the type of crime with which the subject was charged. Yet the defendant's charge was mentioned by the psychiatrists to justify their predictions in only one third of the cases. The criterion most frequently cited was "delusional or impaired thinking." Cocozza & Steadman, *supra* n. 2, 29 Rutgers L. Rev., at 1096.

"The very nature of the adversary system . . . complicates the use of scientific opinion evidence, particularly in the field of psychiatry. This system of partisan contention, of attack and counterattack, at its best is not ideally suited to developing an accurate portrait or profile of the human personality, especially in the area of abnormal behavior. Although under ideal conditions the adversary system can develop for a jury most of the necessary fact material for an adequate decision, such conditions are rarely achieved in the courtrooms in this country. These ideal conditions would include a highly skilled and experienced trial judge and highly skilled lawyers on both sides of the case, all of whom in addition to being well-trained in the law and in the techniques of advocacy would be sophisticated in matters of medicine, psychiatry, and psychology. It is far too rare that all three of the legal actors in the cast meet these standards." Burger, Psychiatrists, Lawyers, and the Courts, 28 Fed. Prob. 3, 6 (June 1964).

Another commentator has noted:

"Competent cross-examination and jury instructions may be partial antidotes . . . , but they cannot be complete. Many of the cases are not truly adversarial; too few attorneys are skilled at cross-examining psychiatrists, laypersons overweigh the testimony of experts, and, in any case, unrestricted use of experts promotes the incorrect view that the questions are primarily scientific. There is, however, no antidote for the major difficulty with mental health 'experts'—that they simply are not experts . . . . In realms beyond their true expertise, the law has little special to learn from them; too often their testimony is . . . prejudicial." Morse, Analysis of Mental Health Law, 51 S. Cal. L. Rev., at 626.

See *id.*, at 535–536. See also Dix, *supra* n. 2, at 44–45; Ennis & Litwack, *supra* n. 2, at 745; Note, *supra* n. 8, 70 Calif. L. Rev., at 1079–1080; J. Robitscher, The Powers of Psychiatry 202–203 (1980).

Nor is the presentation of psychiatric witnesses on behalf of the defense likely to remove the prejudicial taint of misleading testimony by prosecution psychiatrists.[12]   No reputable expert would be able to predict with confidence that the defendant will *not* be violent; at best, the witness will be able to give his opinion that all predictions of dangerousness are unreliable.   Consequently, the jury will not be presented with the traditional battle of experts with opposing views on the ultimate question.   Given a choice between an expert who says that he can predict with certainty that the defendant, whether confined in prison or free in society, will kill again, and an expert who says merely that no such prediction can be made, members of the jury charged by law with making the prediction surely will be tempted to opt for the expert who claims he can help them in performing their duty, and who predicts dire consequences if the defendant is not put to death.[13]

Moreover, even at best, the presentation of defense psychiatrists will convert the death sentence hearing into a battle of

---

[12] For one thing, although most members of the mental health professions believe that such predictions cannot be made, defense lawyers may experience significant difficulties in locating effective rebuttal witnesses. Davis, Texas Capital Sentencing Procedures: The Role of the Jury and the Restraining Hand of the Expert, 69 J. Crim. L. & Criminology 300, 302 (1978).   I presume that the Court's reasoning suggests that, were a defendant to show that he was unable, for financial or other reasons, to obtain an adequate rebuttal expert, a constitutional violation might be found.

[13] "Although jurors may treat mitigating psychiatric evidence with skepticism, they may credit psychiatric evidence demonstrating aggravation. Especially when jurors' sensibilities are offended by a crime, they may seize upon evidence of dangerousness to justify an enhanced sentence." Dix, *supra* n. 2, at 43, n. 215.   Thus, the danger of jury deference to expert opinions is particularly acute in death penalty cases.   Expert testimony of this sort may permit juries to avoid the difficult and emotionally

experts, with the Eighth Amendment's well-established requirement of individually focused sentencing a certain loser. The jury's attention inevitably will turn from an assessment of the propriety of sentencing to death the defendant before it to resolving a scientific dispute about the capabilities of psychiatrists to predict future violence. In such an atmosphere, there is every reason to believe that the jury may be distracted from its constitutional responsibility to consider "particularized mitigating factors," see *Jurek* v. *Texas*, 428 U. S., at 272, in passing on the defendant's future dangerousness. See Davis, *supra* n. 12, at 310.

One searches the Court's opinion in vain for a plausible justification for tolerating the State's creation of this risk of an erroneous death verdict. As one Court of Appeals has observed:

> "A courtroom is not a research laboratory. The fate of a defendant . . . should not hang on his ability to successfully rebut scientific evidence which bears an 'aura of special reliability and trustworthiness,' although, in reality the witness is testifying on the basis of an unproved hypothesis . . . which has yet to gain general acceptance in its field." *United States* v. *Brown,* 557 F. 2d 541, 556 (CA6 1977).

Ultimately, when the Court knows full well that psychiatrists' predictions of dangerousness are specious, there can be no excuse for imposing on the defendant, on pain of his

---

draining personal decisions concerning rational and just punishment. *Id.,* at 46. Doctor Grigson himself has noted both the superfluousness and the misleading effect of his testimony:

" 'I think you could do away with the psychiatrist in these cases. Just take any man off the street, show him what the guy's done, and most of these things are so clearcut he would say the same things I do. But I think the jurors feel a little better when a psychiatrist says it—somebody that's supposed to know more than they know.' " Bloom, Killers and Shrinks, Texas Monthly 64, 68 (July 1978) (quoting Doctor Grigson).

life, the heavy burden of convincing a jury of laymen of the fraud.[14]

### IV

The Court is simply wrong in claiming that psychiatric testimony respecting future dangerousness is necessarily admissible in light of *Jurek* v. *Texas*, 428 U. S. 262 (1976), or *Estelle* v. *Smith*, 451 U. S. 454 (1981). As the Court recognizes, *Jurek* involved "only lay testimony." *Ante*, at 897. Thus, it is not surprising that "there was no suggestion by the Court that the testimony of doctors would be inadmissible," *ibid.*, and it is simply irrelevant that the *Jurek* Court did not "disapprov[e]" the use of such testimony, see *Estelle* v. *Smith*, 451 U. S., at 473.

---

[14] The Court is far wide of the mark in asserting that excluding psychiatric predictions of future dangerousness from capital sentencing proceedings "would immediately call into question those other contexts in which predictions of future behavior are constantly made." *Ante*, at 898. Short-term predictions of future violence, for the purpose of emergency commitment or treatment, are considerably more accurate than long-term predictions. See APA Brief 12, n. 7; Monahan, Prediction Research and the Emergency Commitment of Dangerous Mentally Ill Persons: A Reconsideration, 135 Am. J. Psychiatry 198 (1978); J. Monahan, Clinical Prediction 59–60; Schwitzgebel, *supra* n. 2, at 786. In other contexts where psychiatric predictions of future dangerousness are made, moreover, the subject will not be criminally convicted, much less put to death, as a result of predictive error. The risk of error therefore may be shifted to the defendant to some extent. See *Addington* v. *Texas*, 441 U. S. 418, 423–430 (1979). The APA, discussing civil commitment proceedings based on determinations of dangerousness, states that in light of the unreliability of psychiatric predictions, "[c]lose monitoring, frequent follow-up, and a willingness to change one's mind about treatment recommendations and dispositions for violent persons, whether within the legal system or without, is the *only* acceptable practice if the psychiatrist is to play a helpful role in these assessments of dangerousness." APA, Clinical Aspects 30 (emphasis supplied). In a capital case there will be no chance for "follow-up" or "monitoring." A subsequent change of mind brings not justice delayed, but the despair of irreversible error. See Bonnie & Slobogin, The Role of Mental Health Professionals in the Criminal Process: The Case for Informed Speculation, 66 Va. L. Rev. 427, 442–446 (1980).

In *Smith*, the psychiatric testimony at issue was given by the same Doctor Grigson who confronts us in this case, and his conclusions were disturbingly similar to those he rendered here. See *id.*, at 459–460. The APA, appearing as *amicus curiae*, argued that all psychiatric predictions of future dangerousness should be excluded from capital sentencing proceedings. The Court did not reach this issue, because it found Smith's death sentence invalid on narrower grounds: Doctor Grigson's testimony had violated Smith's Fifth and Sixth Amendment rights. *Id.*, at 473. Contrary to the Court's inexplicable assertion in this case, *ante*, at 899, *Smith* certainly did not reject the APA's position. Rather, the Court made clear that "the holding in *Jurek* was guided by recognition that the inquiry [into dangerousness] mandated by Texas law does *not* require resort to medical experts." 451 U. S., at 473 (emphasis added). If *Jurek* and *Smith* held that psychiatric predictions of future dangerousness are admissible in a capital sentencing proceeding as the Court claims, this guiding recognition would have been irrelevant.

The Court also errs in suggesting that the exclusion of psychiatrists' predictions of future dangerousness would be contrary to the logic of *Jurek*. *Jurek* merely upheld Texas' substantive decision to condition the death sentence upon proof of a probability that the defendant will commit criminal acts of violence in the future. Whether the evidence offered by the prosecution to prove that probability is so unreliable as to violate a capital defendant's rights to due process is an entirely different matter, one raising only questions of fair procedure.[15] *Jurek*'s conclusion that Texas may impose the

---

[15] The Court's focus in the death penalty cases has been primarily on ensuring a fair procedure:

"In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eli-

death penalty on capital defendants who probably will commit criminal acts of violence in no way establishes that the prosecution may convince a jury that this is so by misleading or patently unreliable evidence.

Moreover, *Jurek*'s holding that the Texas death statute is not impermissibly vague does not lead ineluctably to the conclusion that psychiatric testimony is admissible. It makes sense to exclude psychiatric predictions of future violence while admitting lay testimony, see *ante*, at 896–897, because psychiatric predictions appear to come from trained mental health professionals, who purport to have special expertise. In view of the total scientific groundlessness of these predictions, psychiatric testimony is fatally misleading. See *White* v. *Estelle*, 554 F. Supp., at 858. Lay testimony, frankly based on statistical factors with demonstrated correlations to violent behavior, would not raise this substantial threat of unreliable and capricious sentencing decisions, inimical to the constitutional standards established in our cases; and such predictions are as accurate as any a psychiatrist could make. Indeed, the very basis of *Jurek*, as I understood it, was that such judgments *can* be made by laymen on the basis of lay testimony.

Our constitutional duty is to ensure that the State proves future dangerousness, if at all, in a reliable manner, one that ensures that "any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner* v. *Florida*, 430 U. S., at 358. Texas' choice of substantive factors does not justify loading the factfinding process against the defendant through the presentation of what is, at bottom, false testimony.

## V

I would vacate petitioner's death sentence, and remand for further proceedings consistent with these views.

---

gible for the death penalty." *California* v. *Ramos*, *post*, at 999 (emphasis in original).