IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,143






GEORGE RIVAS, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM DALLAS COUNTY





 

 Johnson, J., delivered the opinion of the Court, in which Keller, P.J., and Price,
Womack, Keasler, Hervey, Holcomb, and Cochran, JJ., joined. Meyers, J., concurred as to
point of error seven and otherwise joined the opinion of the Court..


O P I N I O N



 On August 29, 2001, appellant was convicted of capital murder. Tex. Penal Code Ann. §
19.03(a)(1), (a)(2). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal
Procedure Article 37.071, §§ 2(b) and 2(e), (1) the trial judge sentenced appellant to death. Art. 37.071,
§ 2(g). Direct appeal to this Court is automatic. Art. 37.071, § 2(h). Appellant raises seventeen points
of error. We will affirm.

 In his first two points of error, appellant argues that the trial court erred by admitting the written
statement that he gave while he was detained in Colorado. Appellant claims that his statement was
obtained in violation of Colorado law because jail personnel refused to allow the public defender to have
immediate access to him. He contends that the laws of Texas and Colorado conflict as to the admissibility
of his statement and that choice of law principles dictate that Colorado law should apply in this case. Such
conflict, if any, is meaningless. The only relevant inquiry is whether the statement was obtained in
compliance with the dictates of Article 38.22. See Nonn v. State, 41 S.W.3d 677, 679 (Tex. Crim. App.
2001). Appellant does not assert that his statement was obtained in violation of Article 38.22. Points of
error one and two are overruled.

 In his third point of error, appellant contends that he received ineffective assistance of counsel at
the guilt/innocence phase of the trial. During a pretrial hearing, counsel challenged the legality of an
evidentiary search warrant which authorized the taking of appellant's saliva for DNA testing. Counsel
objected that it was an unreasonable search and seizure, the affidavit failed to establish probable cause, and
the warrant was not signed by a district court judge. The trial court overruled counsel's pretrial objections. 
At trial, the state presented evidence without objection that appellant's DNA matched the DNA collected
from the victim's gun and from the driver's seat of the store manager's Ford Explorer, which the assailants
used to flee from the crime scene. Appellant contends that counsel was ineffective because he failed to re-urge his pretrial objections when the DNA evidence was introduced at trial. 

 It was not necessary for counsel to repeat the objections at trial. Fuller v. State, 827 S.W.2d
919, 930 (Tex. Crim. App. 1992), cert. denied, 509 U.S. 922 (1993); TEX. R. APP. P. 103(a)(1). The
pretrial objections were sufficient to preserve error. Id. Point of error three is overruled. 

 In his fourth and fifth points of error, appellant challenges the trial court's refusal to submit to
prospective jurors appellant's requested questionnaire concerning exposure to pretrial publicity. Appellant
alleges in point of error four that the trial court's actions violated Articles 35.17 and 35.16. In point of
error five, he contends that the trial court's actions violated his right to a fair and impartial jury under the
Sixth and Fourteenth Amendments to the United States Constitution.

 Appellant requested the trial court to submit the following questionnaire to the entire panel of
prospective jurors prior to individual voir dire examination:

You have been called as a prospective juror in the State of Texas vs. George Rivas. This
case has received pretrial publicity. George Rivas is charged with causing the death of
Aubrey Hawkins, an Irving police officer, during the course of robbing a [sic] Oshman's
Super Store in Irving, Texas.


Please answer the following questions:


Have you, as a result of the media, hearsay, or any other reason, formed in your mind, an
opinion about the guilty [sic] or innocence of the defendant, George Rivas[?]


 Yes _____ No _____


Would that conclusion influence you in your acts in finding a verdict in the case?


 Yes _____ No _____


Appellant asked the trial court to submit this questionnaire to prospective jurors, before submitting the trial
court's own questionnaire, "in an effort to decide which jurors were preliminarily qualified on the issue of
publicity to fill out additional questions." The trial court refused appellant's request and instead propounded
the following questions concerning publicity: 

PLEASE INDICATE WHETHER YOU AGREE OR DISAGREE WITH THE
FOLLOWING STATEMENTS:


(1) A defendant in a criminal case should be presumed to be innocent unless that [sic] the
State proves their guilt beyond a reasonable doubt, if it does. 

[ ] Agree [ ] Disagree


(2) A jury's verdict should be based only on the evidence heard in the courtroom, and not
from what one hears outside the courtroom. 

[ ] Agree [ ] Disagree


(3) What one hears in the news media is a better source of information than testimony one
hears in the courtroom. [ ] Agree [ ] Disagree


Do you think you have heard about this case? [ ] Yes [ ] No


If yes, please give details (including how you heard - radio, TV, newspaper, word of
mouth).


 After the prospective jurors completed the trial court's questionnaire and before either side began
individual voir dire, appellant again asked the trial judge to submit to the jury the publicity questions
contained in appellant's proposed questionnaire. The trial court again denied appellant's request.

 Appellant argues that the trial court was statutorily required to ask his proposed questions under
Articles 35.17 and 35.16. Article 35.17(2) provides as follows:

In a capital felony case in which the State seeks the death penalty, the court shall propound
to the entire panel of prospective jurors questions concerning the principles, as applicable
to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand
jury, presumption of innocence, and opinion. Then, on demand of the State or defendant,
either is entitled to examine each juror on voir dire individually and apart from the entire
panel, and may further question the juror on the principles propounded by the court.


Art. 35.17(2)(emphasis added). Article 35.16(a)(10) states that a prospective juror may be challenged
for cause if "from hearsay, or otherwise, there is established in the mind of the juror such a conclusion as
to the guilt or innocence of the defendant as would influence him in his action in finding a verdict." Article
35.16(a)(10) further provides: "To ascertain whether this cause of challenge exists, the juror shall first be
asked whether, in his opinion, the conclusion so established will influence his verdict. If he answers in the
affirmative, he shall be discharged without further interrogation by either party or the court." 

 Appellant contends that Article 35.17(2) must be read in conjunction with Article 35.16(a)(10). 
He asserts that Article 35.17 dictates that the trial court "shall" first propound questions to the entire panel
of prospective jurors concerning their "opinions," including their knowledge of the case. Then, under
Article 35.16(a)(10), if a prospective juror has a preexisting conclusion as to the guilt or innocence of the
defendant that would influence his verdict, he must be discharged for cause without further questioning by
either party or the court. 

 By their plain language, Article 35.17 concerns the voir dire examination of prospective jurors,
and Article 35.16 sets out the reasons for making a challenge for cause to a prospective juror. Nothing
in the language of either statute refers to the other. The trial court asked prospective jurors about their
knowledge of the case gained through exposure to pretrial publicity and their opinions about information
from the news media, in compliance with Article 35.17(2). (2) In addition to the publicity-related questions,
the trial court's questionnaire contained the following remarks concerning opinion and pretrial publicity:

There has been news media coverage regarding this case. If chosen as a juror you will
have taken an oath that requires you to return a verdict, whatever that verdict is, on the
basis of the evidence that you hear in the courtroom and not from some outside source. 
Therefore, there is nothing wrong with a prospective juror, such as yourself, having heard
of this defendant. However, it is not permissible if what you have heard causes you to
have a preconceived conclusive opinion that the defendant is guilty or not guilty, or a
preconceived conclusive opinion as to what punishment the defendant should receive, if
found guilty. A juror is not qualified to serve if there is established in the mind of the juror
such a conclusion as to the guilt or innocence of the defendant as would influence the jurors
action(s) in reaching a verdict.


. . . A juror, to be qualified, must set aside any opinion held concerning a defendant's guilt
that was formed by the reading of newspaper accounts, by seeing or hearing other media
reports, or through rumor or hearsay.


 Appellant was also able to examine prospective jurors individually and apart from the entire panel
regarding their opinions resulting from exposure to pretrial publicity, and to make challenges for cause
accordingly. Art. 35.17(2); Art. 35.16(a)(10). The trial court did not abuse its discretion in refusing to
submit appellant's proposed questions to prospective jurors. The trial court neither violated appellant's
statutory rights under Articles 35.17 and 35.16, nor did it violate appellant's constitutional right to a fair
and impartial jury. Points of error four and five are overruled.

 In his sixth point of error, appellant asserts that the trial court violated his constitutional right to a
fair trial by permitting two sheriff's deputies to sit directly behind him during jury selection. Appellant
argues that the presence of two armed guards seated directly behind him "inevitably impacted" the jury's
determination of the future-dangerousness special issue.

 Appellant, to prevail on an appeal claiming reversible prejudice resulting from external juror
influence, must show either actual or inherent prejudice. Howard v. State, 941 S.W.2d 102, 117 (Tex.
Crim. App. 1996). The test to determine actual prejudice is whether jurors actually articulated a
consciousness of some prejudicial effect. Id. 

 Inherent prejudice rarely occurs and is reserved for extreme situations. Id. In Holbrook v. Flynn,
475 U.S. 560 (1986), the Supreme Court distinguished the presence of guards from shackling and held
that reason and common experience weigh against a presumption that the presence of guards in the
courtroom is inherently prejudicial. Id. at 569. We have also held that the presence of guards is not as
inherently prejudicial as shackling. Marquez v. State, 725 S.W.2d 217, 230 (Tex. Crim. App.), cert.
denied, 484 U.S. 872 (1987). Appellant contends that these cases are not applicable because they focus
on external juror influence as it affects the presumption of innocence, while the issue in this case involves
the effect of external juror influence on the jury's determination of future dangerousness. Holbrook and
its progeny are not so limited. In fact, the Supreme Court in Holbrook held that the presence of guards
in a courtroom need not be interpreted as an indication that the defendant is culpable or particularly
dangerous. Holbrook at 569.

 The placement of the two sheriff's deputies behind appellant was not inherently prejudicial. Further,
appellant has not demonstrated actual prejudice. At no time were jurors questioned regarding their
conscious perception of impermissible external influence. Howard, 941 S.W.2d at 117 n. 12. Point of
error six is overruled.

 In point of error seven, appellant contends that the trial court violated Rule 403 in admitting fourteen
autopsy photographs into evidence at the guilt or innocence phase of the trial. Appellant argues that the
number of photographs was excessive, that they were gruesome in nature, and that their prejudicial effect
outweighed any possible probative value. Rule 403 requires that a photograph have some probative
value and that its probative value not be substantially outweighed by its inflammatory nature. Tex. R. Evid.
403; Long v. State, 823 S.W.2d 259, 272 (Tex. Crim. App. 1991), cert. denied, 505 U.S. 1224 (1992). 
A court may consider many factors in determining whether the probative value of photographs is
substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits
offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether
they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof,
and other circumstances unique to the individual case. Long, 823 S.W.2d at 272; Santellan v. State, 939
S.W.2d 155, 172 (Tex. Crim. App. 1997). The admissibility of photographs over an objection is within
the sound discretion of the trial judge. Sonnier v. State, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). 
Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the
autopsy itself. Santellan, 939 S.W.2d at 172; Burdine v. State, 719 S.W.2d 309, 316 (Tex. Crim. App.
1986), cert. denied, 480 U.S. 940 (1987). 

 Appellant complains about the admission of state's Exhibits 195 through 208, autopsy photographs
showing the victim's numerous injuries. The record contains 8 x 10 black-and-white photocopies of the
fourteen original photographs. We cannot determine from the record whether the original photographs
shown to the jury were color or black-and-white. (3) 

 The state introduced evidence that appellant and the other assailants shot the victim multiple times
and ran over his body with an automobile, dragging his body several feet in the process. Exhibits 195
through 200 depict injuries to the victim's head and neck. Exhibit 195 is a front view of the victim's face
showing the wounds, cuts, and abrasions to his face, as well as an identification number on his forehead. 
Exhibit 196 shows the gunshot wound to the victim's eye, with the eye being held open by the medical
examiner. Exhibit 197 is a view of the left side of the victim's head that shows the gunshot wounds to his
face and neck. Exhibit 198 depicts the gunshot wound to the victim's ear. Exhibit 199 shows the gunshot
wound to the back of the victim's neck. Exhibit 200 offers a closer view of the gunshot wounds on the left
side of the victim's face and neck.

 Exhibits 201 through 208 depict the injuries that the victim sustained to the rest of his body. 
Exhibits 201 and 202 show the gunshot wounds to the back of the victim's shoulder and his upper back. 
Exhibit 203 depicts the gunshot wound to the front of the victim's chest as well as abrasions and bruising
in the chest area. Exhibit 204 shows the victim's naked body, from his head to his knees, lying face down
on the autopsy table. Exhibits 205 and 206 show gunshot wounds on the victim's arms, and Exhibits 207
and 208 depict abrasions on his legs. 

 The medical examiner testified that he edited out several of the numerous autopsy photographs and
chose only the ones that were necessary to explain the victim's injuries to the jury. Appellant complains
that "the same information related in the photographs was available to the jury through other less prejudicial
evidence," namely a life-sized mannequin which contained dowels to demonstrate the path of the bullets. 
We disagree. The purpose of the mannequin was to illustrate the entry and exit wounds and the trajectory
of the path that the bullet took through the victim's body, while the autopsy photographs more fully
explained the extent and nature of the victim's injuries. Appellant asserts that Exhibit 203, a photograph
of the injuries to the victim's chest, should have been excluded because it showed suturing and defibrillation
abrasions from resuscitation efforts in the emergency room. The medical examiner testified that the
photograph was necessary to show the abrasions on the victim's chest. He explained to the jury that the
sutured incision and one of the abrasions resulted from emergency resuscitation procedures, and clarified
that the other abrasions were consistent with the victim being shot in the chest while wearing body armor. 
The depiction of the sutured incision in Exhibit 203 is not particularly offensive or gruesome, and the rest
of the photographs at issue portray no more than the gruesomeness of the victim's injuries. Narvaiz v.
State, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992), cert. denied, 507 U.S. 975 (1993).

 The danger of unfair prejudice did not substantially outweigh the probative value of the
photographs. The photographs were relevant and probative to the medical examiner's testimony as to the
nature and extent of the injuries and the cause of death. The trial court did not abuse its discretion in
admitting state's Exhibits 195 through 208. Point of error seven is overruled.

 In his eighth point of error, appellant argues that the trial court erroneously admitted the expert
testimony of Dr. Richard Coons. Coons testified at punishment that it was his opinion that appellant would
be a future danger to society. Appellant asserts that Coons' prediction of future dangerousness was
inadmissible under Tex Rule Evid. 702 (4) because it failed to meet the requirements for scientific reliability,
as defined in Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992) (5), and Nenno v. State, 970
S.W.2d 549 (Tex. Crim. App. 1998) (6).

 In a hearing outside the presence of the jury, Coons testified that he had formed an opinion about
appellant's future dangerousness. His opinion was based on appellant's statements, police and autopsy
reports, witness statements and affidavits, and previous psychiatric evaluations made by other psychiatrists
who had examined appellant. In response to questions from the defense, Dr. Coons testified (1) that he
himself had not examined appellant, (2) that he had not consulted with other experts in the field regarding
his opinion, (3) that he was unaware of any literature or studies regarding predictions of future
dangerousness in capital cases, and (4) that he himself had never performed any follow-up study to
determine the accuracy of his own predictions, and thus did not know the rate of error. 

 The defense then objected on the record to the introduction of Dr. Coons' testimony as failing the
test governing reliability of scientific testimony. The state countered by pointing to Dr. Coons'
qualifications, to the fact that he had testified in similar matters before, and to the fact that the case law
allows psychiatric testimony regarding future dangerousness. The trial court ruled Dr. Coons' testimony
admissible, but allowed a running defense objection. 

 In the presence of the jury, Dr. Coons testified about his education and his extensive qualifications
as a practicing psychiatrist. He testified that he had evaluated thousands of criminal defendants for issues
such as competency to stand trial, sanity at the time of the offense, and the risk of future dangerousness. 
When asked what criteria he used when making assessments of future dangerousness in capital cases, Dr.
Coons listed several factors that he looked at in order to make such determinations: First, he determined
whether the defendant had an "active mental illness." He looked at the defendant's history of violence, his
attitude about violence, and the facts of the offense in question. Then he looked at the defendant's
personality and behavior patterns during his life so far. He considered whether the defendant appeared to
have a conscience to help him control his behavior. And lastly, he looked at the future society of the
defendant (i.e., whether that person would be on death row or in general population). 

 The prosecutor then asked Dr. Coons whether, if he were given a hypothetical fact situation, he
could give an opinion as to whether the individual in the hypothetical would be a continuing danger to
society by committing criminal acts of violence. Dr. Coons replied that he could do so, as a psychiatrist,
if he had enough data. The state then presented a long hypothetical, based on the facts established by the
evidence in appellant's trial, and Dr. Coons expressed his opinion that the person described in the
hypothetical would probably commit criminal acts of violence in the future, which would constitute a
continuing threat to society. Dr. Coons further testified that the person described would not be amenable
to rehabilitation. Although he conceded that "you don't make a diagnosis of somebody that you haven't
evaluated," he opined that the person described would not be suffering from any type of mental disease,
but would have "personality problems" which would not be treatable. 

 Appellant made specific objections on the record to Dr. Coons' testimony, thereby preserving the
issue for appeal. We review the trial court's decision to admit expert testimony under an abuse of
discretion standard. Ortiz v. State, 834 S.W.2d 343, 347 (Tex. Crim. App. 1992).

 In Nenno v. State, this Court held that, when addressing the reliability of the social sciences or
fields that are based primarily upon experience and training as opposed to the scientific method, the
appropriate questions are: (1) whether the field of expertise involved is a legitimate one; (2) whether the
subject matter of the expert's testimony is within the scope of that field; and, (3) whether the expert's
testimony properly relies upon or utilizes the principles involved in that field. Nenno, 970 S.W.2d at 561. 
We noted that while "hard science methods of validation, such as assessing the potential rate of error or
subjecting a theory to peer review, may often be inappropriate for testing the reliability of fields of expertise
outside the hard sciences . . . [w]e do not categorically rule out employing such factors in an appropriate
case." Id. at 561, n.9.

 The proponent of scientific evidence bears the burden of showing that the proffered evidence is
relevant and reliable. Weatherred v. State, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). After a
hearing outside the presence of the jury, the trial court in this case ruled that Dr. Coons' testimony was
admissible. During that hearing, the prosecutor listed the materials that had been provided to Dr. Coons,
and established that Dr. Coons would testify as to his opinion in response to a hypothetical fact situation. 
Dr. Coons did not testify during this hearing about his educational background, his professional experience,
or other qualifications. Nor did he explain the scientific basis for his opinion. The defense attacked the
validity of Dr. Coons' proposed testimony based on the Kelly factors. When asked to respond, the state
argued simply that the case law supported allowing psychiatrists to testify to future dangerousness, that Dr.
Coons was "obviously very qualified, has testified in these matters before," and that he had previous
experience with Mr. Rivas. (7) Because the state presented no other evidence, the trial court's decision to
allow Dr. Coons' opinion was essentially taking judicial notice of the reliability of psychiatric testimony
regarding future dangerousness.

 The trial court's acceptance of the reliability of psychiatric testimony on this subject without
requiring the state to present extrinsic evidence of that reliability is not unusual. Indeed, the United States
Supreme Court held that such testimony was not per se inadmissible almost twenty years ago, in Barefoot
v. Estelle, 463 U.S. 880, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983). Since that time, psychiatric
prediction of future dangerousness has been widely used in our courts. See Griffith v. State, 983 S.W.2d
282, 288 (Tex. Crim. App. 1998)(approving expert opinion about future dangerousness based on review
of investigative reports, crime scene photos, autopsy photos, witness statements, and defendant's school
and personnel records), cert. denied, 528 U.S. 826 (1999); McBride v. State, 862 S.W.2d 600, 609
(1993)(hypothetical question based upon facts in evidence is a permissible form for a psychiatrist's
testimony on the issue of future dangerousness), cert. denied, 512 U.S. 1246 (1994). 

 In deciding Barefoot in 1983, the United States Supreme Court addressed the punishment-phase
testimony of two psychiatrists, who had at that time testified in more than 100 capital cases. After
considering the arguments, including an impassioned amicus brief from the American Psychiatric
Association (8), the Court refused to find such testimony inadmissible per se:

 We are unconvinced, however, at least as of now, that the adversary process cannot be
trusted to sort out the reliable from the unreliable evidence and opinion about future
dangerousness, particularly when the convicted felon has the opportunity to present his
own side of the case.

Barefoot v. Estelle, 463 U.S. at 901 (1983).

 Dr. Coons' testimony in the instant case was certainly much more restrained than the psychiatric
testimony in Barefoot. He did not claim 100% certainty in his prediction, and he admitted that it would not
be proper to diagnose an individual without examining that individual personally. Most of the statements
he made regarding an individual's propensity to commit violent acts in the future were based on common-sense principles (for example, individuals with a long history of violence tend to continue to commit acts
of violence).

 In this case, even if we were to find that the trial court erred in admitting Dr. Coons' testimony
without requiring the state to meet its burden of showing reliability, we could not find that such an error
would have influenced the jury's decision. We review the erroneous admission of testimony at the
punishment phase under Rule 44.2(b) of the Texas Rules of Appellate Procedure. Fowler v. State, 991
S.W.2d 258 (Tex. Crim. App. 1999). Under Rule 44.2(b), we must disregard any error that did not affect
appellant's substantial rights. An appellate court does not overturn a criminal conviction for
non-constitutional error if it, after examining the record as a whole, has fair assurance that the error did not
influence the jury, or influenced the jury only slightly. The appellate court should consider everything in the
record, including testimony and physical evidence, the nature of the evidence supporting the verdict, and
the character of the error and its relationship to other evidence. Schutz v. State, 63 S.W.3d 442 (Tex.
Crim. App. 2001).

 There was evidence that appellant had sexually abused his half-sister as a child. He was serving
seventeen stacked life sentences for violent crimes when he orchestrated the violent prison escape that led
to a police officer's death. After escaping to Colorado, appellant continued to acquire weapons, belying
any claim that he planned to live peacefully on the outside. Dr. Coons' testimony could not have
significantly influenced the jury's decision because appellant himself had demonstrated a continuing
propensity for violent behavior which was unlikely to change. Point of error eight is overruled.

 In point of error nine, appellant argues that "this appeal should be abated until the 

record is supplemented to include the evidentiary search warrant used by the state to obtain DNA evidence
from appellant." Appellant challenges the validity of the search warrant used to obtain a sample of his
DNA. He claims that he cannot brief this issue for appeal without supplementation of the record.

 On September 26, 2002, appellant filed a motion in this Court to abate his appeal so that the
record could be supplemented with the challenged warrant. On October 2, 2002, we granted appellant's
motion to the extent that we ordered the Dallas County District Clerk to supplement the record with the
warrant. On October 10, 2002, we received a letter from the Dallas County District Clerk stating that he
did not find the warrant and its accompanying affidavit in the trial court's file. Our own review of the record
showed that the warrant and affidavit were not contained therein. There was no indication in the record
that the warrant and affidavit were introduced as exhibits in appellant's case. Thus, we denied appellant's
motion in its entirety on October 21, 2002.

 We have already denied appellant's request to abate his appeal for supplementation of the record
because the complained-of warrant and its accompanying affidavit were not introduced into evidence. For
the same reason, we decline to abate the appeal so that appellant can prepare his point of error. Point of
error nine is overruled. 

 Appellant challenges the trial court's parole-law jury instruction in point of error ten. The record
reflects that the trial court submitted a parole-law jury instruction consistent with the one currently set out
in Article 37.071, § 2(e)(2)(B):

Under the law applicable to this case, if the defendant is sentenced to imprisonment in the
Institutional Division of the Texas Department of Criminal Justice for life, the defendant will
become eligible for release on parole, but not until the actual time served by the defendant
equals 40 years, without any consideration of good conduct time. It cannot accurately be
predicted how the parole laws might be applied to this defendant if the defendant is
sentenced to a term of imprisonment for life because the application of those laws will
depend on decisions made by prison and parole authorities, but eligibility for parole does
not guarantee that parole will be granted.


 The trial court also instructed the jury as follows:

During your deliberations, you are not to consider or discuss the possible action of the
Board of Pardons and Paroles or the Governor, nor how long a defendant would be
required to serve on a sentence of life imprisonment, nor how the parole laws would be
applied to this defendant. Such matters come within the exclusive jurisdiction of the Board
of Pardons and Paroles and are of no concern of yours.


Appellant argues that this portion of the instruction erroneously informs the jury not to consider a
life-sentenced appellant's parole eligibility. We disagree. Consistent with Article 37.071, § 2(e)(2)(B),
this part of the charge instructed the jury not to consider how long a life-sentenced appellant would serve
after becoming eligible for parole. See Turner v. State, 87 S.W.3d 111, 116 (Tex. Crim. App. 2002),
cert. denied, 123 S. Ct. 1760 (2003). Point of error ten is overruled.

 Appellant contends in point of error eleven that the mitigation special issue is unconstitutional
because it omits a burden of proof. Appellant argues that Apprendi v. New Jersey, 530 U.S. 466 (2000),
requires the state to prove beyond a reasonable doubt that the mitigation issue should be answered in the
negative.

 Apprendi is inapplicable to Article 37.071. Apprendi applies to facts that increase the penalty
beyond the "prescribed statutory maximum." Under Article 37.071, the "prescribed statutory maximum"
is fixed at death. There are no statutory enhancements. A positive jury finding on the mitigation issue does
not have the potential of increasing the penalty beyond the prescribed statutory maximum. It has the
potential for reducing the prescribed statutory maximum to a sentence of life imprisonment. Further,
Apprendi does not address the burden of proof; it instead addresses the question of who the fact finder
should be for the sentence enhancement. Allen v. State, 108 S.W.3d 281, 285(Tex. Crim. App. 2003). 
Point of error eleven is overruled.

 In point of error twelve, appellant complains that the trial court failed to define the terms
"probability," "criminal acts of violence," and "continuing threat to society" in its charge to the jury at the
punishment phase. Appellant contends that the trial court's failure to instruct the jury properly violated his
rights under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. We have
previously rejected these arguments and have consistently held that these terms need not be defined in the
charge. Ladd v. State, 3 S.W.3d 547, 572-73 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1070
(2000); Camacho v. State, 864 S.W.2d 524, 536 (Tex. Crim. App. 1993), cert. denied, 510 U.S. 1215
(1994). Point of error twelve is overruled.

 Appellant argues in point of error thirteen that Article 37.071 violates the Eighth and Fourteenth
Amendments by requiring at least ten jurors to agree in order to return a negative answer to the punishment
special issues. Art. 37.071, § 2(d)(2) and § 2(f)(2). Citing Mills v. Maryland, 486 U.S. 367 (1988), he
argues that this requirement creates the danger that potential hold-out jurors will believe that their votes in
favor of a life sentence are worthless unless nine others agree to join them. We have previously decided
this issue adversely to appellant. Williams v. State, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996);
Lawton v. State, 913 S.W.2d 542, 558-59 (Tex. Crim. App. 1995), cert. denied, 519 U.S. 826 (1996);
Draughon v. State, 831 S.W.2d 331, 337-38 (Tex. Crim. App. 1992), cert. denied, 509 U.S. 926
(1993). Point of error thirteen is overruled.

 Appellant complains in his fourteenth and fifteenth points of error that the Texas capital sentencing
scheme violated his rights under the Fifth, Eighth, and Fourteenth Amendments to the United States
Constitution and Article I, §§ 13 and 19, of the Texas Constitution. Appellant argues that the Texas
scheme is unconstitutional "because of the impossibility of simultaneously restricting the jury's discretion
to impose the death penalty while also allowing the jury unlimited discretion to consider all evidence
militating against imposition of the death penalty." In support of his argument, appellant relies upon Justice
Blackmun's dissenting opinion in Callins v. Collins, 510 U.S. 1141 (1994). 

 We have repeatedly rejected these state and federal constitutional claims. Bell v. State, 938
S.W.2d 35, 53-54 (Tex. Crim. App. 1996), cert. denied, 522 U.S. 827 (1997); McFarland v. State,
928 S.W.2d 482, 520 (Tex. Crim. App. 1996), 519 U.S. 1119 (1997); Lawton, 913 S.W.2d at 558. 
Appellant's fourteenth and fifteenth points of error are overruled.

 In appellant's sixteenth and seventeenth points of error, he alleges that "the cumulative effect of the
above-enumerated constitutional violations" denied him due process and due course of law under the
federal and state constitutions. We have recognized the proposition that a number of errors may be found
harmful in their cumulative effect; however, here we have rejected each of appellant's points of error
individually. Without error, there is no cumulative effect. Chamberlain v. State, 998 S.W.2d 230, 238
(Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000); Wyatt v. State, 23 S.W.3d 18, 30 (Tex.
Crim. App. 2000). Appellant's sixteenth and seventeenth points of error are overruled.

 We affirm the judgment of the trial court.


 Johnson, J.

Delivered: June 23, 2004

En banc 

Do Not Publish
1. Unless otherwise indicated, all future references to Articles refer to the Texas Code of Criminal Procedure.
2. "Opinion" questions include questions concerning potential jurors' "knowledge of the case." Martinez
v. State, 867 S.W.2d 30, 35 n. 7 (Tex. Crim. App. 1993)(citing Esquivel v. State, 595 S.W.2d 516, 522 (Tex. Crim. App.),
cert. denied, 449 U.S. 986 (1980)), cert. denied, 512 U.S. 1246 (1994). 


 
3. Rule 34.6(g)(2) of the Texas Rules of Appellate Procedure provides for the appellate court's use of
original exhibits:


If the trial court determines that original exhibits should be inspected by the appellate court or sent
to that court in lieu of copies, the trial court must make an order for the safekeeping,
transportation, and return of those exhibits. The order must list the exhibits and briefly describe
them. To the extent practicable, all the exhibits must be arranged in their listed order and bound
firmly together before being sent to the appellate clerk. On any party's motion or its own initiative,
the appellate court may direct the trial court clerk to send it any original exhibit.


TEX. R. APP. P. 34.6(g)(2).
4. Rule 702 TESTIMONY BY EXPERTS 


 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to
determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may
testify thereto in the form of an opinion or otherwise. 
5. These factors include, but are not limited to: (1) acceptance by the relevant scientific community, (2)
qualifications of the expert, (3) literature concerning the technique, (4) the potential rate of error of the technique, (5)
the availability of other experts to test and evaluate the technique, (6) the clarity with which the underlying theory or
technique can be explained to the court, and (7) the experience and skill of the person applying the technique. Kelly
v. State, 824 S.W.2d 568, 573 (Tex. Crim. App. 1992).
6. The Nenno factors are "merely an appropriately tailored translation of the Kelly test to areas outside of
hard science." Nenno, 970 S.W.2d at 561.
7. Coons had apparently made a similar prediction of future dangerousness at appellant's 1994 robbery trial 
when he predicted that appellant would be involved in gang activity in the penitentiary and would probably be a
leader. In fact, as the defense brought out on cross-examination, appellant avoided gang involvement during his
time in the penitentiary. 
8. According to the APA brief:


Although a likelihood of future violent behavior may be assigned to a given individual solely on the basis of
statistical "base rates" and other information of an actuarial nature, psychiatric determinations in this area have little
or no independent validity. We believe, therefore, that diagnoses of "sociopathy" or "antisocial personality
disorder," and predictions of future behavior characterized as "medical opinions," serve only to distort the
factfinding process. Because the prejudicial impact of such assertedly "medical" testimony far outweighs its
probative value, it should be barred altogether in capital cases. 


Brief Amicus Curiae For the American Psychiatric Association, Barefoot v. Estelle, 463 U.S. 880, 103 S. Ct. 3383, 77 L.
Ed. 2d 1090 (1983)(No. 82-6080).


The APA brief also argued that the introduction of such evidence through an "expert" prejudices the defendant in
two ways:

 First, psychiatric testimony is likely to be given great weight by a jury simply because it is, or
purports to be, a statement of professional opinion. A psychiatrist comes into the courtroom
wearing a mantle of expertise that inevitably enhances the credibility, and therefore the impact, of
the testimony. . . . Second, and more important, psychiatric predictions of violent conduct unduly
facilitate a jury's finding of future dangerousness by providing a clinical explanation for what is, at
best, only an assessment of statistical probabilities. 


Brief Amicus Curiae For the American Psychiatric Association, Barefoot v. Estelle, 463 U.S. 880 (1983)(No. 82-6080).